708 S.E.2d 755

**UTILITIES SERVICES OF SOUTH CAROLINA, INC., Appellant,**

v.

**The SOUTH CAROLINA OFFICE OF REGULATORY STAFF, Respondent.**

No. 26952.

Supreme Court of South Carolina.

Heard Nov. 4, 2010.

Decided March 28, 2011.

---

Mitchell Willoughby, John M. S. Hoefer, and Benjamin P. Mustian, all of Willoughby & Hoefer, of Columbia, for Appellant.

Florence P. Belser, Jeffrey M. Nelson, and Nanette S. Edwards, all of Columbia, for Respondent.

Justice KITTREDGE.

This appeal from the denial of an application for a rate increase presents us with several questions about the proper role of the Public Service Commission ("PSC") following 2004 statutory amendments altering the structure and operation of the PSC. Of particular significance are the respective roles and responsibilities of the PSC and the Office of Regulatory Staff ("ORS"), which was created by the 2004 amendments. We hold the PSC retains its fundamental role as fact-finder. In this case, the PSC acted well within its rights in requesting additional information regarding Appellant's expenditures, even when those expenditures were not initially challenged by ORS. Nevertheless, because we find the PSC's evaluation of Appellant's rate application was affected by several errors of law, we reverse and remand for further proceedings.[1]

## I.

Appellant Utilities Services of South Carolina, Inc. ("Utility") was established in 2002 as a wholly owned subsidiary of Utilities, Inc. ("UI"). Utility supplies water to over 6,800 customers in eighty-one South Carolina neighborhoods and wastewater services to over 370 customers in four neighborhoods. In some of these neighborhoods, Utility supplies water that it purchases in bulk from other water systems. Customers in these neighborhoods are known as "distribution-only" customers.

In January 2006, the PSC approved an increase to Utility's rates. This rate schedule distinguished between regular residential customers and distribution-only customers. Distribution-only customers were charged a basic facilities charge, a "commodity charge" that varied based on usage, and a pro rata portion of the cost to Utility for its purchase of bulk water. The regular residential customers were charged a basic facilities charge and a higher commodity charge.

In August 2007, Utility again applied for a rate increase. Utility requested the PSC use the "rate of return on rate

---

1. ORS is nominally the Respondent, but it joins Appellant in seeking a reversal. The actions of the PSC have not been defended on appeal.

base"[2] method to determine the reasonableness of its proposed rates. Utility claimed it had invested three million dollars in "plant additions"[3] since its previous rate case, resulting in a rate base of approximately 9.7 million dollars.[4] To achieve its desired rate of return on rate base, Utility requested an increase to the basic facilities charge and to the commodity charge for both regular residential and distribution-only customers.

The PSC held public hearings regarding the 2007 application in York, Anderson, and Richland Counties. At the public hearings, Utility customers from seven neighborhoods testified to various problems with the quality of their water. The main complaints were that Utility's water tasted and/or smelled bad, caused damage to fixtures and appliances, and did not adequately clean clothes. One customer testified she had received notice from Utility that the water system in her neighborhood contained elevated levels of lead. Several customers testified that, because of the poor quality of Utility's water, they invested in water softeners and water filters or drank bottled water.

In light of these concerns, one customer questioned the fairness of Utility's request for an increase to its basic facili-

---

2. "The 'rate base' is the amount of investment on which a regulated public utility is entitled to an opportunity to earn a fair and reasonable return." *Southern Bell Telephone & Telegraph Co. v. Public Service Comm'n of S.C.*, 270 S.C. 590, 600, 244 S.E.2d 278, 283 (1978). It "represents the total investment in, or the fair value of, the used and useful property which it necessarily devotes to rendering the regulated services." *Id.* The rate of return on rate base is "[d]etermined by dividing the net income for return by the rate base." *Heater of Seabrook, Inc. v. Public Service Comm'n of S.C. (Heater of Seabrook II)*, 332 S.C. 20, 24 n. 2, 503 S.E.2d 739, 741 n. 2 (1998).

3. In the context of water services, the term "plant" means "[a]ll facilities owned by the utility for the collection, production, purification, storage, transmission, metering, and distribution of potable water." 26 S.C.Code Ann. Regs. 103–702.16 (1976 & Supp.2010). In the context of sewerage services, the term "plant" includes a plant and any other property owned by a utility and "used in its business operations of providing sewerage collection and/or sewerage disposal service to its customers." 26 S.C.Code Ann. Regs. 103–502.13 (1976 & Supp.2010).

4. Utility presented testimony that its current rate of return on rate base is 1.59%. The rate of return on rate base approved in Utility's 2006 rate case was 8.37%.

ties charge. She noted that, because the basic facilities charge was a flat rate charge, Utility's revenues would increase even if its customers avoided using its water.

In addition, customers from eleven neighborhoods testified they had not seen any capital improvements and/or improvements in water quality since the last rate increase. In fact, one customer testified the quality of Utility's water service had declined.

Bruce T. Haas, regional director of operations for UI, testified that Utility has a "capital improvements program" and "ongoing operational programs such as routine testing and periodic water main flushing to improve water quality." Haas listed the types of capital improvements Utility had made since it acquired its water systems in 2002, but he did not specify which of these improvements had occurred since the last rate increase.

The PSC asked Haas whether Utility planned any capital improvements in the neighborhoods the customers complained about. Haas was able to name some programs in one neighborhood, but he did not provide specific information about any other neighborhood. Rather, he reiterated the general types of upgrades Utility had implemented "since [it] took over," and stated Utility upgraded "nearly every single facility that [it] had." [5]

In addition to its questions regarding capital improvements, the PSC asked Utility about the reasonableness of payments Utility made to its affiliate, Bio–Tech. Bio–Tech is a wholly owned subsidiary of UI that provides sludge hauling services, wastewater plant maintenance, and construction services. A Utility witness testified that Bio–Tech charged the same price to all of its customers, regardless of whether they were affiliates. Thus, she contended, Bio–Tech's prices were market rates. However, she was unable to provide the PSC with

---

5. Haas also commented that customers might not be aware of the improvements Utility made in their neighborhoods. We note, however, that Haas testified Utility had "an automatic message delivery system" that provided "specific information to customers in a particular geographic area or subdivision, advising them of upgrades or repairs being done to their system."

information about whether Utility had compared Bio–Tech's prices to the prices of Bio–Tech's competitors.

Representatives of ORS then testified, and they verified that Utility had made at least some capital improvements following its last rate case. However, ORS also suggested several adjustments to Utility's figures. Thus, ORS recommended the PSC find Utility had a rate base of 9.14 million dollars.[6]

The PSC denied Utility's application for a rate increase. It found the customer complaints "raise[d] questions as to where the capital improvements and on-going operations programs testified to by the Company witness were implemented, and whether they were effective." It concluded that "[w]ithout more specificity on the part of the Company," it could not "credit the Company with the capital improvements and on-going operations that it purports to have made." Moreover, it found that because Utility "failed to identify for the most part where the [claimed] expenditures were made, or how such expenditures contributed to improved service[,]" it could not determine whether those expenditures "were appropriate and whether [they] justified the imposition of a rate increase." In addition, the PSC found Utility "failed to provide required information regarding affiliate transactions with ... Bio–Tech." Utility appeals.

## II.

■■■■■■ The PSC's ratemaking decisions are entitled to deference, and will be affirmed if supported by substantial evidence. *S.C. Energy Users Comm. v. S.C. Public Service Comm'n,* 388 S.C. 486, 490, 697 S.E.2d 587, 589 (2010). "Substantial evidence is relevant evidence that, considering the record as a whole, a reasonable mind would accept to support an administrative agency's action." *Porter v. S.C. Public Service Comm'n,* 333 S.C. 12, 20, 507 S.E.2d 328, 332 (1998). "We will not substitute our judgment for that of the PSC where there is room for a difference of intelligent opinion." *Kiawah Property Owners Group v. Public Service Comm'n of S.C.,* 357 S.C. 232, 237, 593 S.E.2d 148, 151 (2004). However,

---

6. ORS calculated Utility's current rate of return on rate base as 2.85%.

we "may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the [PSC's] findings, inferences, conclusions, or decisions are: ... (b) in excess of the statutory authority of the agency; (c) made upon unlawful procedure; [or] (d) affected by other error of law." S.C.Code Ann. § 1–23–380(5) (2005 & Supp.2010).

## III.

A fundamental question presented by both Utility and ORS is this: can the PSC determine that a regulated utility has failed to meet its burden to prove expenditures when ORS has not challenged the expenditures? The answer to this question requires us to examine the nature of the PSC.

Prior to 2004, the PSC was empowered to "supervise and regulate the rates and service of every public utility ... and to fix just and reasonable standards, classifications, regulations, practices and measurements of service to be furnished, imposed or observed and followed by every public utility in this State." S.C.Code Ann. § 58–3–140 (1976). In addition, the PSC was empowered to "upon its own motion, institute an inquiry into any subject matter within its jurisdiction." S.C.Code Ann. § 58–5–280 (1976). The PSC could request detailed reports from any public utility regarding its "business affairs or any matter pertaining thereto" and conduct "examination[s] of the books, papers, accounts and records" of utilities if "necessary to procure the information required." S.C.Code Ann. § 58–3–190 (1976); S.C.Code Ann. § 58–3–210 (1976). When a utility sought to change its rates, the PSC could "make such investigations as in its opinion the public interest require[d]." S.C.Code Ann. § 58–5–250 (1976). The PSC could "employ ... technical, administrative or clerical staff or other aid" to assist in carrying out these duties. S.C.Code Ann. § 58–3–60 (1976). In short, the PSC performed both investigative and adjudicative functions.

In 2004, the General Assembly eliminated the PSC from the roles of investigator and auditor, and it reassigned these roles to a newly-created agency, ORS. S.C.Code Ann. § 58–3–60(D) (1976 & Supp.2010) ("The commission shall not inspect, audit, or examine public utilities. The inspection, auditing, and examination of public utilities is solely the responsibility of the

Office of Regulatory Staff."). ORS now has the power to review and investigate rate applications, and to make recommendations to the PSC. *See* S.C.Code Ann. § 58–4–50(A)(1) (Supp.2010). ORS also has the duty to "represent the public interest in commission proceedings...." *Id.* § 58–4–50(A)(4).

█ The PSC's powers with regard to ratemaking were not eliminated, however. The PSC retained its powers "to supervise and regulate" rates and service and "to fix just and reasonable standards, classifications, regulations, practices, and measurements of service." S.C.Code Ann. § 58–3–140(A) (1976 & Supp.2010). Pursuant to these powers, the PSC is entitled to create incentives for utilities to improve their business practices. Accordingly, the PSC may determine that some portion of an expense actually incurred by a utility should not be passed on to consumers. *Patton v. S.C. Public Service Comm'n,* 280 S.C. 288, 292, 312 S.E.2d 257, 259–60 (1984); *see Southern Bell Telephone,* 270 S.C. at 599, 244 S.E.2d at 283 (finding it was not improper for the PSC to consider whether a utility could undertake measures to cut costs and improve efficiency).

When presiding over a ratemaking proceeding, the PSC takes on a quasi-judicial role. *See* S.C.Code Ann. § 58–3–30(B) (1976 & Supp.2010) ("The commissioners ... are bound by the Code of Judicial Conduct...."); S.C.Code Ann. § 58–3–260 (Supp.2010) (limiting *ex parte* communications between the PSC and any party to a "matter to be adjudicated, decided, or arbitrated" by the PSC). Nevertheless, it may request ORS conduct an investigation of a rate application:

> The commission has the authority to **initiate inspections, audits, and examinations** of all persons and entities subject to its jurisdiction.... Notwithstanding any other provision of law, the commission **must not conduct** such inspections, audits, and examinations itself, but must request that they be conducted by the Office of Regulatory Staff pursuant to Section 58–4–50(A)(2).

S.C.Code Ann. § 58–3–200 (1976 & Supp.2010) (emphasis added). South Carolina Code section 58–4–50(A)(2) provides:

> [W]hen considered necessary by the Executive Director of [ORS] and in the public interest, [ORS has the duty and responsibility to] make inspections, audits, and examinations

of public utilities regarding matters within the jurisdiction of the commission. **The regulatory staff has sole responsibility for this duty but shall also make such inspections, audits, or examinations of public utilities as requested by the commission.**

(Emphasis added). *See also* S.C.Code Ann. § 58–4–50(B) (providing, in relevant part, that "upon request, the Executive Director of [ORS] must employ the resources of the regulatory staff to furnish to the commission . . . such information and reports . . . and provide other assistance as may reasonably be required in order to supervise and control the public utilities of the State. . . .").

Thus, the PSC's new role in ratemaking proceedings conforms to the general principle that the roles of investigator and adjudicator should be performed by separate persons. *Cf.* S.C. Const. art I, § 22 ("[N]or shall [a person] be subject to the same person for both prosecution and adjudication. . . ."); *Ross v. Medical University of S.C.*, 328 S.C. 51, 69–70, 492 S.E.2d 62, 72 (1997) (explaining that article 1, section 22 aims to prevent an adjudicator from becoming impartial by gathering *"ex parte* information as a result of prior investigation").

■ Considering these authorities together, we hold the PSC is the ultimate fact-finder in a ratemaking application. It has the power to independently determine whether an applicant has met its burden of proof. The PSC is not bound by ORS's determination that an expenditure was reasonable and proper for inclusion in a rate application. The PSC may determine—independent of any party—that an expenditure is suspect and requires further scrutiny. To accept the contention that the PSC is bound by the recommendations of ORS would place ORS in the same untenable dual investigative—adjudicative role that challenged the PSC prior to the 2004 amendments.

Having established that the PSC was entitled to make an independent determination about whether Utility met its burden of proof, we turn now to a discussion of the contours of that burden.

## IV.

Utility has argued the PSC acted arbitrarily and in conflict with its prior practice when it required neighborhood-by-neighborhood data in response to customer complaints. In addition, Utility argues the PSC erred in requiring additional data to support its payments to Bio–Tech. As explained above, the PSC was entitled to request more information about Utility's expenditures before ruling on whether those expenditures were properly included in the rate application.[7]

Nevertheless, we hold the PSC committed three errors of law in determining Utility failed to meet its burden of proof. First, we hold the PSC was required to provide Utility with a meaningful opportunity to supplement its application with the information the PSC requested. Second, we hold the PSC erred in failing to accord Utility the presumption of reasonableness applicable to its expenses. Finally, we hold the PSC erred in denying the rate application as a whole where only *some* of Utility's expenditures were brought into question.

### A. Meaningful Opportunity to Respond

■ Consistent with its obligation to provide Utility an opportunity to achieve a reasonable return,[8] the PSC was obligated to accord Utility a meaningful opportunity to rebut the evidence presented in opposition to its proposed rates. *Cf.* 26 S.C.Code Ann. Regs. 103–845(C) (Supp.2010) ("[T]he Commission shall require any party and the Office of Regulatory

---

7. In addition, we reject Utility's argument that a request for neighborhood-by-neighborhood data was unprecedented. *See In re Carolina Water Service, Inc.,* No.2006–92–WS, 2007 WL 4944726, at *2 (S.C.P.S.C. Nov.19, 2007) (in which the PSC requested a UI affiliate provide "a listing of each subdivision served . . . and complete financial data for its individual systems").

8. *Bluefield Waterworks & Improvement Co. v. Public Service Comm'n of W. Va.,* 262 U.S. 679, 690, 43 S.Ct. 675, 67 L.Ed. 1176 (1923) (explaining that where the rates charged by a public utility company "are not sufficient to yield a reasonable return on the value of the property used at the time it is being used to render the service . . . their enforcement deprives the public utility company of its property in violation of the Fourteenth Amendment"); *Southern Bell Telephone,* 270 S.C. at 595–97, 600, 244 S.E.2d at 281, 283 (recognizing a regulated public utility is entitled to "an opportunity to earn a fair and reasonable return" on its investments).

Staff to file copies of testimony and exhibits and serve them on all other parties of record within a specified time in advance of the hearing."). Here, the PSC denied Utility's application for a rate increase on the ground that Utility failed to meet its burden of proof. However, Utility supplied the information expressly required by the PSC's regulations, and the PSC did not give Utility a meaningful opportunity to provide the additional information the PSC determined was necessary. This was an error of law.

The information an applicant must provide in support of its proposed rate increase is set forth by regulation. These regulations do not explicitly require neighborhood-by-neighborhood data, nor do they require any particular type of data regarding the reasonableness of payments to an affiliated entity. *See* 26 S.C.Code Ann. Regs. 103–512.4(A) (1976 & Supp.2010) (requirements for wastewater utilities seeking an increase in existing rate); 26 S.C.Code Ann. Regs. 103–712(4)(A) (1976 & Supp.2010) (requirements for water utilities seeking an increase in existing rates); 26 S.C.Code Ann. Regs. 103–823 (Supp.2010) (applications in general).

Consequently, Utility had no notice the PSC would require additional information about specific neighborhoods until the PSC requested that information at a public hearing. Under those circumstances, Utility was able to give only generalized answers and answers from memory, rather than the targeted and specific data the PSC seems to have desired. Similarly, while Utility could expect the PSC to examine the reasonableness of its transactions with an affiliate,[9] it had no notice prior to its hearing that the PSC would require information about the prices charged by Bio–Tech's competitors.

The PSC was entitled to request this information pursuant to its role as fact-finder and pursuant to regulation. *See* 26 S.C.Code Ann. Regs. 103–512.4(A)(16) (requiring an applicant for a rate increase to include with its application "[a]ny other pertinent or relevant information determined necessary by the

---

**9.** *See Kiawah Property Owners Group v. Public Service Comm'n of S.C.,* 338 S.C. 92, 95, 525 S.E.2d 863, 864 (1999) (holding the PSC is required to "review and analyze ... intercompany dealings and determine if they are reasonable" but that such dealings are not required to "meet a level of review stricter than the other analysis done by the PSC.").

commission."); 26 S.C.Code Ann. Regs. 103–712(4)(A)(16) (same). Nevertheless, where the PSC seeks additional information beyond that which its regulations explicitly require, it must give an applicant an appropriate opportunity to gather data in response.

Because the PSC did not give Utility a fair opportunity to respond in this case, we reverse and remand for further proceedings. *Cf. Hilton Head Plantation Utilities, Inc. v. Public Service Comm'n of S.C.,* 312 S.C. 448, 449–52, 441 S.E.2d 321, 322–23 (1994) (after finding the PSC did not err in denying a rate increase based on the lack of evidence before it, remanding to provide the utility "an ample opportunity to explain its expenditures and justify them").

## B. Presumption of Reasonableness

Utility contends that it could satisfy its burden of proof simply by comparing its current test year [10] expenses with the expenses from the test year for its previous rate case. We disagree.

Utility is correct that it was entitled to a presumption that its expenditures were reasonable and incurred in good faith, and therefore, a showing that its expenses had increased since its last rate case *could* satisfy its burden of proof. Nevertheless, the presumption in a utility's favor clearly does not foreclose scrutiny and a challenge. In those circumstances, the burden remains on the utility to demonstrate the reasonableness of its costs. It seems to us that Utility wants the presumption of reasonableness to be dispositive. In *Hamm,* 309 S.C. at 286–87, 422 S.E.2d at 112–13, we stated:

> Although the burden of proof of the reasonableness of all costs incurred which enter into a rate increase request rests with the utility, the utility's expenses are presumed to be reasonable and incurred in good faith. This presumption does not shift the burden of persuasion but shifts the burden of production **on to the Commission or other**

---

10. A "test year" is used to provide a "forecast of [a] utility's rate base . . . and expenses [for] the near future." *Hamm v. S.C. Public Service Comm'n,* 309 S.C. 282, 289, 422 S.E.2d 110, 114 (1992). The assets, revenues, and expenses in the test year are adjusted to reflect any "known and measurable changes" at the time of the hearing. *Southern Bell Telephone,* 270 S.C. at 602, 244 S.E.2d at 284.

**contesting party** to demonstrate a tenable basis for raising the specter of imprudence. This evidence may be provided ... through the Commission's broad investigatory powers. **The ultimate burden of showing every reasonable effort to minimize ... costs remains on the utility.**

(Emphasis added) (citations omitted). *Hamm* was decided prior to the creation of ORS and the accompanying change in the role of the PSC. It holds true, however, that an investigation by ORS might "rais[e] the specter of imprudence." And, as we have discussed, the PSC may initiate an ORS investigation. Thus, if an investigation initiated by ORS *or* by the PSC yields evidence that overcomes the presumption of reasonableness, a utility must further substantiate its claimed expenditures.

■ Utility next argues, based on *Hamm,* that testimony by **non-party** customers cannot overcome the presumption of reasonableness.[11] Non-party members of the public (also known as "protestants") are entitled to voice an objection to proposed rates by providing sworn testimony at a public hearing, and this sworn testimony becomes part of the formal record before the PSC. 26 S.C.Code Ann. Regs. 103–804(E), (R) (1976 & Supp.2010); 26 S.C.Code Ann. Regs. 103–827 (Supp.2010). Protestants are permitted to object "on the ground of private or public interest." 26 S.C.Code Ann. Regs. 103–804(R).

In *Hilton Head,* 312 S.C. at 449–51, 441 S.E.2d at 322–23, we upheld the PSC's decision to deny a rate increase on the ground that a non-party protestant had questioned whether the utility's transactions with its corporate parent were conducted at arm's length, and the utility had failed to provide an adequate response. Though *Hilton Head* concerned affiliate expenses, and therefore, no presumption of reasonableness applied,[12] our opinion did not so limit the PSC's ability to

---

11. Because the customers who testified at the public hearings did not move to intervene, they were not parties.

12. *Id.* at 450–51, 441 S.E.2d at 323 ("[W]hen payments are made to an affiliate, a mere showing of actual payment does not establish a *prima facie* case of reasonableness. Charges arising out of intercompany relationships between affiliated companies should be scrutinized with care, and if there is an absence of data and information from which the

consider non-party testimony. Rather, we held the PSC "had the duty to believe or disbelieve [the] evidence submitted." *Id.* at 451, 441 S.E.2d at 323.

Because the PSC is both entitled and required to consider the evidence presented to it on the formal record, we hold the PSC is entitled to rely on sworn testimony presented by non-party protestants to overcome the presumption of reasonableness. Accordingly, we hold the PSC could consider customer testimony that Utility's water quality had not improved and that capital improvements had not been made when determining whether to credit Utility with the expenditures for capital improvement that it claimed.[13]

Nevertheless, the customer testimony in this case could only have "rais[ed] the specter of imprudence" as to expenditures that Utility claimed to have incurred in neighborhoods where customers alleged no improvements were made. These customers could offer no insight into whether Utility made capital improvements in other neighborhoods. Thus, as discussed below, we hold the PSC erred in failing to accord Utility the presumption of reasonableness as to expenditures that were not called into question by customer testimony or by any other source.

## C. Unchallenged Expenditures

While we recognize the PSC was entitled to determine Utility should not be credited with *some* of the expenditures it claimed, Utility argues, and we agree, that the concerns raised at the public hearings were not sufficient to

---

reasonableness and propriety of the services rendered and the reasonable cost of rendering such services can be ascertained ... allowance is properly refused." (citations omitted)).

**13.** Utility also argues that, even if the PSC could consider non-party testimony, it could not consider testimony that was unsubstantiated by scientific or quantifiable data. We reject this argument and hold that the substantiation (or lack thereof) of customer testimony goes to its weight, not its admissibility. *See* 26 S.C.Code Ann. Regs. 103–846(A) (Supp.2010) ("The rules of evidence as applied in civil cases in the Court of Common Pleas shall be followed" in ratemaking proceedings); Rule 402, SCRE ("All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of the State of South Carolina, statutes, these rules, or other rules promulgated by the Supreme Court of South Carolina.").

overcome the presumption of reasonableness as to *all* of Utility's claimed expenditures. Thus, rather than denying Utility's rate application in its entirety, the PSC should have adjusted Utility's application to reflect only those expenditures the PSC determined should be passed on to consumers. *See Patton,* 280 S.C. at 292, 312 S.E.2d at 259–60 (finding the PSC could refuse to pass a portion of an expense on to ratepayers, in the interest of promoting good business practices).

ORS investigated Utility's expenditures and made adjustments where it found they were necessary, thereby reducing Utility's claimed rate base by more than $550,000. Customer testimony regarding water quality and the lack of capital improvements brought the prudence of certain other expenditures into question. However, the customers who testified represented only a small portion of the eighty-one neighborhoods in which Utility provides water service. Utility, on the other hand, testified it made improvements to almost every water system it owned. The PSC was required to consider whether, even putting aside the expenditures it found questionable, Utility was entitled to some increase in its rates.

Likewise, because Utility's payments to its affiliate accounted for only a small portion of Utility's budget, a decision to exclude those expenses from Utility's rate application could not justify an outright denial of the rate increase.

In sum, we find the PSC could rely on non-party testimony, or on any other relevant evidence, to determine that the presumption of reasonableness had been overcome as to a particular expense. Nevertheless, the PSC should have credited Utility with the expenses that were not challenged. Accordingly, on remand, and after giving Utility the opportunity to meaningfully respond to the evidence challenging the rate increase recommended by ORS, the PSC must determine whether, even excluding any expenses it finds imprudent, Utility's expenses have increased since its last rate application such that it might be entitled to an increase in its rates.

## V.

Utility has raised two other ways in which it contends the PSC erred as a matter of law. First, Utility argues the PSC may not consider notions of fairness when evaluating a rate

application. Second, Utility argues the PSC may not consider the fact that Utility received a rate increase in the recent past. We address these arguments in turn.

## A. Fairness of a Rate Increase

■■■ Distribution-only customers from nine subdivisions testified the price of Utility's service was unreasonable by comparison to the prices charged by the water systems from which Utility purchased its water. In addition, distribution-only customers testified that, because they are charged a pro rata portion of the total water purchased by Utility from its suppliers, they are made to pay for water that leaks when Utility equipment fails. This concern was corroborated by ORS. Accordingly, ORS recommended a change to Utility's rate structure: it recommended the PSC place a "cap" on the amount of unaccounted for water that may be charged to Utility's distribution-only customers.

The PSC found customer testimony about the rates charged by Utility versus by its suppliers raised "questions of fairness with regard to [Utility's] price." The PSC stated that "[i]f the difference in rates is justifiable, the customers deserve to know why." Moreover, the PSC stated it could not find evidence in the record supporting an increase in the distribution-only customers' rates.

Utility now argues the concept of fairness, unaccompanied by objective criteria, is an arbitrary standard improper for consideration by the PSC in ratemaking proceedings. We agree.

We have held the PSC's duty to fix "just and reasonable" rates includes a duty to **distribute fairly** the revenue requirements [of the utility], considering the price at which the company's service is rendered and the quality of that service." *Seabrook Island Property Owners Ass'n v. S.C. Public Service Comm'n*, 303 S.C. 493, 499, 401 S.E.2d 672, 675 (1991) (emphasis added). The PSC retained its duty to fix "just and reasonable" rates following the 2004 amendments to its role in ratemaking. Accordingly, the PSC is not precluded from considering fairness, provided it does so in the context of an objective and measurable framework.

Nevertheless, to the extent the PSC questioned the fairness of Utility's distribution-only rates solely because those rates were higher than the rates charged by neighboring entities, the PSC erred as a matter of law. We have held on several occasions that it is improper for the PSC to draw comparisons with other entities without stating its basis for finding the entities sufficiently similar for comparison purposes. *E.g., Heater of Seabrook II,* 332 S.C. at 26, 503 S.E.2d at 742 ("[T]he order refers to Carolina Water Service ... as the comparison standard. However, there is no evidence whatsoever in the record giving any information about Carolina Water Service.... [I]t would be impossible for an appellate court to afford meaningful review to any comparison findings regarding this utility.").

On remand, the PSC may consider whether the structure of the requested rate increase is unfair, such that a different method of raising the necessary revenues might be preferable. *See Seabrook Island Property Owners,* 303 S.C. at 499, 401 S.E.2d at 675 (stating the PSC had a duty to "distribute fairly the revenue requirements [of the utility]"). It may not, however, require Utility to explain as a general matter why its rates are higher than the rates charged by other entities, absent a showing that those entities are sufficiently similar to the applicant to allow a meaningful comparison.

### B. Recent Rate Increase

A utility may file an application for a rate increase no more than once per year. S.C.Code Ann. § 58–5–240(F) (1976 & Supp.2010). Our case law suggests that a previous rate increase may provide a baseline for the PSC to use in determining whether a utility has incurred additional expenses requiring additional revenue. *Cf. Heater of Seabrook, Inc. v. Public Service Comm'n of S.C. (Heater of Seabrook I),* 324 S.C. 56, 61, 478 S.E.2d 826, 828 (1996) ("To show that its expenses have increased, Heater need only introduce data comparing the expenses from the test year used in the previous rate case with those from the test year in this case....").

Utility argues, however, that the PSC used Utility's recent rate increase as part of its justification for denying the current rate application. To the extent the PSC did so, this

was error. *Cf. Heater of Seabrook II*, 332 S.C. at 29, 503 S.E.2d at 743 (finding it was "inappropriate" for the PSC to rely in a 1997 order on its reasoning in a 1992 order granting an increase to the same company because "this order ... was based on evidence, and a prior test year, completely different from [the utility's] financial condition at the time of the current application."). The PSC must not use the simple fact of a recent rate increase as a reason to deny a utility's rate application. An application for a rate increase must stand or fall on its own merits. A recent rate increase provides only a starting point for determining whether a utility's rate base or expenses have increased, such that additional revenues are required.

## VI.

Utility and ORS have presented us with a dispute about the fundamental role of the PSC in ratemaking decisions post–2004. We hold the PSC has retained its role as the ultimate fact-finder. As such, it may consider all evidence before it and it does not serve as a "rubber stamp" for ORS's recommendations. The PSC's powers are tempered, however, by its obligation to give a utility a meaningful opportunity to present additional evidence in support of its application. Moreover, the PSC must not deny an application in its entirety when only a small portion of the expenditures claimed by the utility have been called into question. Rather, the PSC must determine whether, even excluding the questioned expenditures, the utility is entitled to a rate increase.

Because we find the PSC's evaluation of Utility's rate application was affected by several errors of law, we reverse and remand for further proceedings.

**REVERSED AND REMANDED.**

PLEICONES, Acting Chief Justice, BEATTY, HEARN, JJ., and Acting Justice JAMES E. MOORE, concur.