# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Duke Energy Carolinas, LLC, Appellant-Respondent,

v.

South Carolina Office of Regulatory Staff, Hasala Dharmawardena, CMC Recycling, Cypress Creek Renewables, LLC, South Carolina Department of Consumer Affairs, Sierra Club, South Carolina Coastal Conservation League, South Carolina Energy Users Committee, South Carolina Solar Business Alliance, Inc., South Carolina State Conference of the National Association for the Advancement of Colored People, Upstate Forever, Vote Solar, and Walmart, Inc., Respondents,

of whom South Carolina Energy Users Committee is Respondent-Appellant.

Appellate Case No. 2019-001900

and

Duke Energy Progress, LLC, Appellant,

v.

South Carolina Office of Regulatory Staff, Nucor Steel-South Carolina, Cypress Creek Renewables, LLC, South Carolina Department of Consumer Affairs, Sierra Club, South Carolina Coastal Conversation League, South Carolina Energy Users Committee, South Carolina Solar Business Alliance, Inc., South Carolina State Conference of the National Association for the Advancement of Colored People, Upstate Forever, Vote Solar, and Walmart, Inc., Respondents.

Appellate Case No. 2019-001904

---

Appeal from the Public Service Commission

---

Opinion No. 28066
Heard May 26, 2021 – Filed October 27, 2021

---

**AFFIRMED**

---

Robert E. Stepp and Frank R. Ellerbe III, both of
Robinson Gray Stepp & Laffitte, LLC, of Columbia;
Sarah P. Spruill, of Haynsworth Sinkler Boyd, P.A., and
Heather Shirley Smith, both of Greenville; and Thomas
S. Mullikin, of Mullikin Law Firm, of Camden, all for
Appellants-Respondents Duke Energy Carolinas, LLC
and Duke Energy Progress, LLC.

Jeffrey M. Nelson, Jenny Rebecca Pittman, C. Lessie
Hammonds, Andrew M. Bateman, Alexander W.
Knowles, Christopher Michael Huber, and Steven W.
Hamm, all of Columbia, and Wallace K. Lightsey, of
Wyche Law Firm, of Greenville, all for Respondent
South Carolina Office of Regulatory Staff; Scott Elliott,
of Elliott & Elliott, P.A., of Columbia, for Respondent-
Appellant South Carolina Energy Users Committee;
Carolyn Grube Lybarker, of Columbia, and Laura
Rebecca Dover, of York, both for Respondent South
Carolina Department of Consumer Affairs; Alexander
George Shissias, of The Shissias Law Firm, LLC, of
Columbia, for Respondent CMC Recycling; Richard L.
Whitt, of Whitt Law Firm, LLC, of Irmo, Stephanie
Underwood Eaton and Carrie H. Grundmann, both of
Spilman Thomas & Battle, PLLC, of Winston-Salem,
North Carolina, and Derick P. Williamson, of
Mechanicsburg, Pennsylvania, all for Respondents

Cypress Creek Renewables, LLC, South Carolina Solar
Business Alliance, Inc., and Walmart, Inc.; Bess Jones
DuRant, of Sowell & DuRant, LLC, of Columbia, and
Thadeus B. Culley, of Chapel Hill, North Carolina, both
for Respondent Vote Solar; Robert Guild, of Robert
Guild, Attorney at Law, of Columbia, and Bridget M.
Lee, of Washington, D.C., both for Respondent Sierra
Club; and Katherine Lee Mixson, of Southern
Environmental Law Center, of Charleston, and Gudrun
E. Thompson and David L. Neal, both of Chapel Hill,
North Carolina, all for Respondents South Carolina
Coastal Conservation League, Upstate Forever, and
South Carolina State Conference of the National
Association for the Advancement of Colored People.

Wm. Grayson Lambert and Bradley S. Wright, both of
Burr & Forman, LLP, of Columbia, for Amicus Curiae
South Carolina Farm Bureau Federation.

---

**ACTING CHIEF JUSTICE KITTREDGE:** This case involves two consolidated cross-appeals from the Public Service Commission's (PSC) determinations regarding the most recent ratemaking applications filed by Duke Energy Carolinas, LLC (DEC) and Duke Energy Progress, LLC (DEP) (collectively, Duke or the two Duke entities).[1] Each Duke entity owns one coal-fired power plant in South Carolina and seven coal-fired power plants in North Carolina, for a total of sixteen affected plants. In their ratemaking applications, the two Duke entities sought recovery for expenses related to their plants in both states, with those costs shared proportionately between their North and South Carolina customers. The PSC, in two lengthy and thoughtful orders, allowed in part and disallowed in part the requested expenses. On appeal, Duke now contends the PSC erred in disallowing (1) environmental compliance costs associated with North Carolina law; (2) litigation costs incurred by Duke in defending itself from various lawsuits; and (3) carrying costs on specified deferred accounts. In the cross-appeal, the South Carolina Energy Users Committee (SCEUC) contends the PSC erred in allowing DEC recovery of costs associated with a now-abandoned

---

[1] DEC and DEP are two of nine wholly-owned subsidiaries of Duke Energy Corporation, one of the largest power-generating companies in the country.

nuclear project in Cherokee County (the Lee Nuclear Project) because of the South Carolina General Assembly's recent repeal of the Base Load Review Act (BLRA).

We affirm the PSC's decisions in full because its decisions are supported by substantial evidence in the record, are not arbitrary or capricious, and are not controlled by an error of law. The PSC's orders in these two cases are exemplary in that they clearly set forth in detail the arguments and evidence presented by both sides, and then equally clearly articulate reasons for selecting one side's arguments or evidence over the other. Many of the issues on appeal involve judgment calls based on factual determinations, and given our deferential standard of review, we cannot say the PSC's decisions are unsupported or irrational. Moreover, after careful review, we respectfully reject Duke's effort to recast the PSC's factual findings as legal errors. We therefore affirm the PSC's comprehensive orders.

# I.

## a. History of CCR Treatment and Regulation

Beginning in the 1920s, much of Duke's power generation came from coal-fired power plants, each of which produced coal combustion residuals (CCRs or, colloquially, coal ash) as a byproduct of energy production.[2] Until the 1950s, and in accordance with industry standards and environmental laws (or, more accurately, the lack thereof) at the time, CCRs were manually collected and transported to storage or dumping sites, most of which were unlined landfills.[3] However, in the 1950s, the electric utility industry began to utilize a water sluice

---

[2] CCRs include fly ash (fine ash powder released into the air), bottom ash (the coarser ash left behind in the furnace after coal is burned), boiler slag (melted bottom ash), and flue gas desulfurization materials (a mixture of noxious gases produced during combustion). *See* 40 C.F.R. § 257.53 (2021). "These residuals vary in their size and texture, but all contain contaminants of environmental concern." *Util. Solid Waste Activities Grp. v. Env't Prot. Agency*, 901 F.3d 414, 421 (D.C. Cir. 2018) (per curiam) (internal alternation and quotation marks omitted) (citation omitted).

[3] An unlined landfill is a depression in the ground with nothing preventing the potential contamination of the surrounding dirt or groundwater from the material placed in the landfill; whereas a lined landfill is a depression in the ground that has some sort of impermeable material along the bottom and sides that prevents seepage.

process that automatically transported CCRs to ash storage basins, also known as coal ash ponds.[4]  This process was known as wet ash handling and, obviously, created a significant amount of polluted wastewater.  The wet ash handling process was unregulated until the Clean Water Act was passed in the 1970s.  From then until 2015, a coal-fired power plant was required to obtain a Clean Water Act permit issued pursuant to the National Pollutant Discharge Elimination System (NPDES).  A violation of the NPDES permit constituted a violation of the Clean Water Act.  Thus, so long as the plant complied with its NPDES permit, wet ash handling was considered the standard, legal way to dispose of CCRs.

Nonetheless, it was known from at least the late 1970s that CCR wastewater presented a serious potential source of surface and groundwater contamination, and that the wastewater could cause extensive environmental damage if not properly handled.  Likewise, the risks CCRs posed to human health were well documented.  As a result, beginning around the late 1970s, the practice of using unlined coal ash ponds to dispose of CCRs and the associated wastewater became the subject of sporadic criticism and concern, albeit not federal lawmaking.

*b. The Beginnings of Modern CCR Regulation*

In December 2008, there was a catastrophic coal ash spill in Tennessee that released 5.4 million cubic yards of coal ash and wastewater into a nearby river, affecting about three hundred acres of land surrounding the coal ash pond.  As a result, in June 2010, the United States Environmental Protection Agency (EPA) proposed new additional regulations under the Resource Conservation and Recovery Act to directly address the risks associated with the disposal of CCRs, rather than only incidentally regulating CCR disposal under the Clean Water and Clean Air Acts.  Pursuant to the federal Administrative Procedures Act, the proposed regulations were the subject of extensive study, examination, and comments from a variety of special interest groups ranging from environmental organizations to the electric utility industry.

Meanwhile, in North Carolina in 2011 and 2012, several Duke employees, including engineers and a station manager, recommended inspecting via video camera specific pipes leading to the Dan River plant's coal ash pond, at a cost of approximately $20,000.  These Duke employees were concerned that the pipes may have deteriorated over time.  Duke management denied the modest funding

---

[4] Consistent with the landfills that were used previously, these coal ash ponds were also generally unlined.

requests. Less than two years later, in February 2014, a sixty-year-old pipe at the Dan River facility failed, resulting in the unpermitted discharge of approximately 27 million gallons of coal ash wastewater and 39,000 tons of coal ash, which flowed more than 62 miles down the Dan River in North Carolina and Virginia. Apparently, the pipe had never been examined since its installation in the 1950s, and a subsequent inspection revealed extensive corrosion that would have been visible had the video survey been performed as requested.

Duke subsequently entered pleas for criminal negligence related to its handling of the Dan River spill, including admitting its negligence in operating and maintaining the coal ash pond for years prior to the spill. Likewise, Duke pled guilty to criminal negligence and state environmental violations related to additional, unpermitted coal ash leaks at several of its other plants that resulted in further environmental damage in North Carolina.

*c. The Resulting North Carolina Statutory Scheme: CAMA*

Acting quickly after the Dan River spill, the North Carolina General Assembly took only two months to draft an initial, comprehensive statutory scheme intended to address CCR storage and cleanup in the state, titling the new legislation the Coal Ash Management Act of 2014 (CAMA).[5] *See generally* N.C. Gen. Stat. §§ 130A-309.200 to .231 (2021). In the preface of CAMA, the North Carolina General Assembly specifically stated its actions were taken in response to the Dan River spill. Likewise, the North Carolina General Assembly stated the intent of CAMA was to protect the health and safety of the public. After slight revisions, CAMA was formally enacted in August 2014, approximately six months after the Dan River spill.

In broad strokes, CAMA imposed a number of strict requirements on the continued operation of coal-fired power plants in North Carolina. For example, CAMA prohibited the continued use of wet ash handling, instead requiring coal-fired plants to dispose of their CCRs without the use of, or storing them in, water. Likewise, CAMA mandated the closure of all existing coal ash ponds in the state. To that end, the North Carolina Department of Environmental Quality was charged with assigning a risk classification to all coal-fired plants in the state depending on

---

[5] Prior to the Dan River spill, the North Carolina General Assembly was not considering legislation to address coal ash storage or cleanup. In fact, the initial CAMA preface stated that "the issue of coal ash storage ha[d] not been adequately addressed in North Carolina for more than six decades."

the level of danger they posed to the surrounding environment and communities, with possible classifications of high-, intermediate-, or low-risk. The risk classifications corresponded to the speed and method required to close a plant's coal ash ponds, with higher-risk plants being required to close their ponds more quickly and in a more restrictive fashion than lower-risk plants.[6]

*d. The Federal CCR Rule*

Almost a year after CAMA was enacted, the EPA finalized its proposed regulations, setting uniform federal guidelines for the disposal of CCRs under the Resource Conservation and Recovery Act. *See generally* 40 C.F.R. §§ 257.1–.107, 261.1–.1090 (2021). These new regulations, colloquially referred to as the CCR Rule, set a national "floor" for the safe disposal of CCRs, but encouraged states to set higher standards if they deemed it appropriate. *See* Hazardous and Solid Waste Management System; Disposal of Coal Combustion Residuals from Electric Utilities, 80 Fed. Reg. 21301, 21430 (Apr. 17, 2015) (codified at 40 C.F.R. pts. 257, 261) ("[The] EPA recognizes that some states have already adopted requirements that go beyond the minimum federal requirements . . . . This rule will not affect these state requirements. *The federal criteria promulgated today are minimum requirements and do not preclude [s]tates[] from adopting more stringent requirements where they deem to be appropriate*." (emphasis added)). Generally speaking, the CCR Rule was less restrictive than CAMA. For example, unlike CAMA, the CCR Rule did not explicitly prohibit wet ash handling, did not require all coal ash ponds to close, imposed longer deadlines for the closures that were required, and allowed less stringent closure methods. The CCR Rule also did not apply to inactive coal ash ponds (i.e., ponds that were not receiving new coal ash wastewater) at retired plants, and therefore, absent state law to the contrary, those ponds could remain open indefinitely, even if they were unlined.[7]

---

[6] For example, high-risk plants were required to close their coal ash ponds ten years sooner than low-risk plants. Likewise, high-risk plants were required to move the dewatered ash to a lined landfill so as to prevent contamination of the surrounding soil and groundwater, whereas low-risk plants were permitted to "cap in place," i.e., leave the remaining dewatered ash in place in an unlined landfill and merely cover it with a layer of dirt and topsoil.

[7] Although the CCR Rule does not currently apply to inactive coal ash ponds at retired plants, the United States Court of Appeals for the District of Columbia Circuit found that exemption was arbitrary and capricious and remanded to the EPA for further rulemaking. *See Util. Solid Waste Activities Grp.*, 901 F.3d at

*e. DHEC Consent Agreements*

As North Carolina state law, CAMA only applies in North Carolina and, therefore, does not apply to the coal ash ponds at Duke's two coal-fired plants in South Carolina. Nonetheless, following the passage of CAMA, Duke voluntarily approached DHEC and entered into consent agreements in which it agreed to excavate the coal ash ponds at both plants and place the ash in lined landfills.[8] In exchange, DHEC agreed not to sue Duke for any future problems related to the coal ash ponds at Duke's two South Carolina plants.

*f. Duke's 2017 North Carolina Ratemaking Application*

In May and July 2017, DEC and DEP, respectively, filed applications for ratemaking with the North Carolina Utilities Commission. Ultimately, the Utilities Commission awarded Duke the full amount of the coal ash remediation expenses Duke believed should be added to its utility rates in North Carolina, minus a $100 million "mismanagement penalty," which was to be amortized over five years. The Utilities Commission did not specifically explain how it arrived at the $100 million penalty, instead generally stating that the penalty was "based on the totality of evidence contained in the record" and was somehow related to Duke's rate of return that "would have been allowed if there were sound management." Likewise, the Utilities Commission broadly stated Duke's "mismanagement t[ook] the form of admitted inadequate oversight of its CCR activities that placed service to consumers at risk and, at least indirectly, increased costs," referring to the guilty pleas stemming from the Dan River spill. Additionally, the Utilities Commission

---

432–34, 449. The parties here suggest the EPA is likely to amend the CCR Rule to apply to inactive coal ash ponds at inactive plants. However, the EPA has not issued a final rule yet, and there is no way to tell what shape the final rule will take. Duke owns two retired plants in North Carolina with inactive coal ash ponds that are required to close under CAMA, when the ponds would not otherwise be impacted by the current CCR Rule.

[8] DEC entered into the agreement for its South Carolina plant in September 2014 (after the passage of CAMA only), and DEP entered the agreement for its South Carolina plant in July 2015 (after the passage of both CAMA and the CCR Rule).

authorized Duke full recovery of its litigation expenses, as well as the ability to receive carrying costs on deferred accounts, including coal ash remediation expenses.[9]

Subsequently, the Supreme Court of North Carolina affirmed the Utilities Commission's order in almost its entirety, with the exception of a single issue not presented in this appeal. *See State ex rel. Utils. Comm'n v. Stein*, 851 S.E.2d 237 (N.C. 2020). In general, the state supreme court's decision was derived largely from the standard of review, specifically, that there was substantial evidence in the record to support the Utilities Commission's decision. *See id.* at 257–58, 273.

### g. Duke's 2018 South Carolina Ratemaking Application

In November 2018, DEC and DEP filed separate applications for ratemaking with the PSC. In both applications, Duke requested the ability to increase its rates so as to compensate it for (1) expenditures related to coal ash remediation in North and South Carolina (including both CAMA-compliance costs and costs associated with the DHEC consent agreements); (2) litigation expenses related to defending itself in various coal ash lawsuits; (3) carrying costs on certain deferred accounting expenses; and (4) construction costs actually incurred in pursuing the Lee Nuclear Project.[10]

As to the coal ash remediation expenses, the PSC granted Duke slightly less than 50% of the amount requested. The amount allowed corresponded to the costs associated with complying with the CCR Rule and the DHEC consent agreements; the amount disallowed corresponded to costs that were solely attributable to CAMA. As to the litigation expenses, the PSC denied recovery entirely, finding Duke failed to provide sufficient evidence to substantiate its claimed legal fees. As to the carrying costs, the PSC ruled Duke could recover any money spent on

---

[9] The dissenting opinion finds the North Carolina proceedings significant and persuasive, which should be unsurprising given that the Utilities Commission generally allowed CAMA related expenses (minus the $100 million mismanagement penalty) in the North Carolina proceedings. CAMA, of course, had (and continues to provide) a direct benefit to North Carolina.

[10] SCEUC refers to these costs as "preconstruction" costs. However, because Duke actually incurred the amounts requested, the expenses were not mere estimates of the cost of future construction, i.e., were not true "preconstruction" costs. As a result, we will refer to them simply as construction costs.

operations and maintenance costs, but could not receive a profit for having delayed recovery of those expenses by placing them into deferral accounts.  Finally, as to the recovery of costs associated with the Lee Nuclear Project, the PSC allowed the expenses, finding they were prudently incurred, and that the General Assembly's repeal of the BLRA did not foreclose Duke from recovering its actual expenses in a general ratemaking proceeding.

Duke and SCEUC filed petitions for rehearing, but the PSC affirmed its original orders in full.  The Duke entities and SCEUC then directly appealed to this Court.  *See* Rule 203(d)(2)(A), SCACR (requiring appeals from the PSC to be filed with the Clerk of this Court).  We consolidated the cases prior to oral argument.

## II.

This Court has long followed the governing principles set forth by the Supreme Court of the United States in its two seminal utility regulation cases: *Bluefield Water Works & Improvement Co. v. Public Service Commission*,[11] and *Federal Power Commission v. Hope Natural Gas Co.*[12]  In *Bluefield*, the Supreme Court explained:

> A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding, risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures.  The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties.

262 U.S. at 692–93.  Likewise, in *Hope Natural Gas Co.*, the Supreme Court stated that a public utilities commission is

---

[11] 262 U.S. 679 (1923).

[12] 320 U.S. 591 (1944).

not bound to the use of any single formula or combination of formulae in determining rates. Its rate-making function, moreover, involves the making of "pragmatic adjustments." . . . Under the statutory standard of "just and reasonable" [rates,] it is the result reached[,] not the method employed[,] which is controlling. It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry . . . is at an end. The fact that the method employed to reach that result may contain infirmities is not then important.

320 U.S. at 602 (internal citations omitted).

In general, "the PSC should evaluate the evidence in accordance with objective and consistent standards." *Daufuskie Island Util. Co. v. S.C. Office of Regul. Staff*, 427 S.C. 458, 463, 832 S.E.2d 572, 574–75 (2019). Nonetheless, the PSC is permitted to modify its existing policies or practices, as it is "not bound by its prior decisions, and it may re-examine and alter its previous findings as to reasonableness when conditions warrant." *S. Bell Tel. & Tel. Co. v. Pub. Serv. Comm'n*, 270 S.C. 590, 610, 244 S.E.2d 278, 288 (1978) (Ness, J., concurring in part and dissenting in part); *see also* 73A C.J.S. *Public Administrative Law and Procedure* § 352 (June 2021 Update) (explaining that stare decisis does not ordinarily bind administrative bodies to their prior decisions—or the principles and policies underlying those decisions—and that while prior decisions are entitled to great weight, so long as the administrative body rationally justifies its change of position, it may depart from prior rule or practice).

On appeal, this Court's review of PSC decisions is governed by section 1-23-380 of the South Carolina Code (Supp. 2020). *Daufuskie*, 427 S.C. at 463, 832 S.E.2d at 575. Pursuant to that statute, the Court may not substitute its judgment for an agency's judgment as to the weight of the evidence on questions of fact. S.C. Code Ann. § 1-23-380(5). Rather, we may reverse or modify an administrative decision only when the findings or conclusions are affected by an error of law, clearly erroneous, or arbitrary and capricious. *Id.* § 1-23-380(5)(d)–(f).

In the same vein, we have repeatedly recognized that the General Assembly has designated the PSC as the "expert" in regulating rates and services of public utilities in the state. *See Seabrook Island Prop. Owners Ass'n v. S.C. Pub. Serv. Comm'n*, 303 S.C. 493, 496, 401 S.E.2d 672, 674 (1991); *see also, e.g., Duquesne Light Co. v. Barasch*, 488 U.S. 299, 313 (1989) (explaining a state's public utilities

commission "is essentially an administrative arm of the legislature"); *Hamm v. S.C. Pub. Serv. Comm'n*, 309 S.C. 282, 287, 422 S.E.2d 110, 113 (1992) ("The [PSC] sits as the trier of facts, akin to a jury of experts."); *Patton v. S.C. Pub. Serv. Comm'n*, 280 S.C. 288, 291, 312 S.E.2d 257, 259 (1984) ("The [PSC] is recognized as the 'expert' designated by the legislature to make policy determinations regarding utility rates; thus, the role of a court reviewing such decisions is very limited.").  As a result, the Court generally affords the PSC a wide range of discretion in utility ratemaking cases.  *Seabrook Island Prop. Owners Ass'n*, 303 S.C. at 496, 401 S.E.2d at 674.  "We [therefore] will not substitute our judgment for that of the PSC where there is room for a difference of intelligent opinion." *Utils. Servs. of S.C., Inc. v. S.C. Office of Regul. Staff*, 392 S.C. 96, 103, 708 S.E.2d 755, 759 (2011) (citation omitted); *see also S. Bell Tel. & Tel. Co.*, 270 S.C. at 597–98, 244 S.E.2d at 282 ("The weighing of the evidence and the drawing of the ultimate conclusion therefrom as to what return is necessary to enable a utility to attract capital is for the [PSC], not the reviewing court. . . .  The reason for that status is not expertness [of the Commissioners] in fact, but the circumstance that the [PSC] is the delegatee of the power of the Legislature." (citation omitted)).

Likewise, the Court must view the PSC's findings on appeal as "presumptively correct, [and] the party challenging the [PSC's] order bears the burden of convincingly proving the decision is clearly erroneous, or arbitrary or capricious, or an abuse of discretion, in view of the substantial evidence of the record as a whole."  *S.C. Energy Users Comm. v. S.C. Pub. Serv. Comm'n*, 388 S.C. 486, 491, 697 S.E.2d 587, 590 (2010).

## III.

## Coal Ash Expenses

*a. Underlying Facts*

Two primary witnesses testified on behalf of Duke regarding the utility's coal ash remediation expenses.  The first was Dr. Julius Wright, who testified generally about the regulatory principles surrounding the recovery of environmental costs. Wright explained the CCRs at issue here were produced by coal-fired plants located in both North and South Carolina that were "used and useful in providing low-cost, reliable power to South Carolina customers for more than a century." Wright also emphasized Duke's historic practice—and the PSC's historic approval—of cost sharing between the utility's North and South Carolina ratepayers, with total system costs being split on an approximately 75/25 basis between the two states' customers.  Wright stated that because of Duke's traditional

practice of power production and cost sharing between Duke's North and South Carolina customers, "South Carolina's average retail rates have historically been below the national average." Wright further opined there was "no doubt" the Dan River spill prompted the North Carolina General Assembly to enact CAMA.[13] Nonetheless, Wright testified Duke should be permitted to recover its coal ash remediation expenses in recognition of the fact that there was a historic practice of cost sharing between North and South Carolina ratepayers.

Wright also filed a series of exhibits with his testimony indicating that between 2015 and 2018, Duke spent approximately $5.4 billion on coal ash remediation for its sixteen coal-fired plants in the Carolinas. Of that $5.4 billion, Duke sought to allocate approximately $1.5 billion to its South Carolina customers. Of note, one of Wright's exhibits supplied year-by-year figures incurred at each of Duke's coal-fired plants for coal ash remediation expenses, with DEP seeking a total of $635 million for its eight plants, and DEC seeking $876 million.

The second Duke witness that testified regarding the coal ash remediation expenses was Jon Kerin, who explained the $1.5 billion in requested costs stemmed from Duke becoming subject to federal (CCR Rule) and North Carolina (CAMA) regulatory requirements that mandated closure of Duke's coal ash ponds and other coal ash storage areas. According to Kerin, Duke had always disposed of its CCRs in compliance with then-current regulatory requirements and industry practices; the requested costs here were merely the result of recent changes in the law that required remediation of Duke's prior coal ash storage practices. Like Wright, Kerin opined that because "South Carolina customers receive[d] the benefit from electricity generated at [Duke's] South Carolina and North Carolina plants, [] South Carolina customers should also share costs from the generation process of electricity production in both South Carolina and North Carolina," including any post hoc environmental compliance costs.

Similar to Wright, Kerin filed a series of exhibits with his testimony that addressed the coal ash remediation costs. Relevant to this appeal, Kerin filed an original and a revised Exhibit 10, which listed a single number for each of Duke's sixteen plants representing the total coal ash remediation cost incurred at that location between 2015 and 2018 (i.e., the exhibit did not list year-by-year subtotals for each plant, as did Wright's exhibits). Kerin's original Exhibit 10 included numbers identical to those found in Wright's exhibits ($635 million for DEP and $876 million for DEC).

---

[13] Wright did not believe the Dan River spill in any way contributed to the CCR Rule.

However, Kerin's *revised* Exhibit 10 presented at the hearing included drastic changes to those numbers, with DEP's total amount requested revised downward by nearly one-third—from $635 million to $434 million, an over $200 million difference—and DEC's total adjusted upward by approximately $20 million. Neither Kerin nor any other Duke witness provided any explanation for how such an egregious error in calculating the total, previously-incurred expenses had occurred.[14]  Moreover, Wright's more granular exhibits were not similarly revised, making it unclear at best exactly how much Duke actually sought to recover related to its coal ash remediation expenses, or how those amounts were calculated.

The South Carolina Office of Regulatory Staff (ORS, one of the respondents here) also offered two primary witnesses to testify regarding the coal ash remediation expenses.  The first witness, Michael Seaman-Huynh, explained Duke commonly directly assigned certain costs to its North or South Carolina ratepayers and, often, those costs were derived from laws or regulations that were specific to each jurisdiction.  Providing specific examples of this practice, Seaman-Huynh cited Duke's handling of expenses stemming from (1) the Energy Efficient Portfolio Standard, Clean Smokestacks Act, and Renewable Portfolio Standards, all of which were North Carolina statutory schemes, the compliance costs of which Duke directly assigned to its North Carolina customers alone; as well as (2) the Distributed Energy Resources Act, a South Carolina law for which Duke directly assigned the compliance costs to its South Carolina customers alone.  Seaman-Huynh also pointed to Duke's allocation to North Carolina ratepayers of some of the CAMA costs in the instant ratemaking proceeding.  According to Seaman-Huynh, South Carolina customers should be exempt from *all* incremental cost differences that were directly attributable to North Carolina state laws, not merely *some* of those incremental cost differences.

The second ORS witness was Dan Wittliff, who opined the Dan River spill and Duke's mismanagement of its coal ash ponds in North Carolina played a deciding role in the development and implementation of CAMA.  According to Wittliff, North Carolina laws—over which Duke's South Carolina customers had no meaningful input or control—should not place an additional burden on the ratepayers in South Carolina, particularly when South Carolina customers did not receive a meaningful benefit from those laws.

---

[14] Recall this ratemaking proceeding was heard in 2019, while the requested expenses were allegedly incurred between 2015 and 2018.

After detailing the major differences between CAMA and the CCR Rule, Wittliff proposed allowing coal ash remediation expenses in full at eight of Duke's sixteen coal-fired plants, but disallowing in part certain expenses at the other eight plants. In general, Wittliff recommended allowing any remediation costs associated with complying with either the CCR Rule or the DHEC consent agreements, but disallowing at that time the portion of remediation costs associated with complying with CAMA alone. Wittliff explained for each of the eight affected plants how he parsed the costs associated with CAMA versus the CCR Rule.

For example, Wittliff explained that two of Duke's North Carolina plants were retired plants with inactive coal ash ponds. As a result, while CAMA required closure of the coal ash ponds at both plants, the CCR Rule did not apply to those plants at all, and therefore, any remediation costs incurred at those two plants were imposed pursuant to CAMA rather than the CCR Rule.[15] Accordingly, for those two plants, Wittliff recommended disallowing all of the requested remediation costs.

As a more-nuanced second example, Wittliff testified that DEP's Sutton plant was classified by the North Carolina General Assembly as high-risk and, therefore, was required by CAMA to close its coal ash ponds under a greatly accelerated schedule compared to what would have been required under the CCR Rule. Specifically, CAMA required Duke to *complete* the closure of Sutton's coal ash ponds by 2019, whereas under the CCR Rule, Duke would not have been required to even *begin* closing Sutton's coal ash ponds until late 2020. As a result of the hastened closing schedule, Wittliff explained Sutton's coal ash ponds had to be dewatered and excavated at an accelerated rate, and Duke was forced to ship two million tons of CCRs from Sutton's coal ash ponds by rail and by truck over 100 miles away to a permissible disposal site. The transportation costs were prohibitively expensive, but were required due to the CAMA deadline and Duke's inability to create a lined landfill—the only permissible closure method at Sutton under CAMA—in that timeframe. According to Wittliff, had Duke been permitted to follow the

---

[15] Wittliff acknowledged it was likely the EPA would amend the CCR Rule in the future to require remediation at those two plants, but opined it was purely speculative at that point to estimate how much or what type of remediation would be required until the amendments were actually promulgated. *See Util. Solid Waste Activities Grp.*, 901 F.3d at 432–34, 449 (finding the CCR Rule's current exemption for inactive coal ash ponds at retired plants was arbitrary and capricious, and remanding to the EPA for amendments to the CCR Rule).

guidelines set forth in the CCR Rule instead, much of those expenses could have been avoided.

Nonetheless, Wittliff agreed with Duke witnesses that the engineering and project-planning portion of the coal ash remediation expenses at the Sutton facility were necessarily incurred in order to "synchronize work between all of the coal ash sites being closed in the next 20 years, as well as to gain synergies between excavation/capping plans for all the sites." Therefore, Wittliff recommended allowing those expenses, which he calculated as approximately 14% of the total requested expenses at Sutton based on similar, average figures at the other Duke plants.[16]

Ultimately, the PSC granted Duke $707.9 million in coal ash remediation expenses, slightly less than half of the $1.5 billion Duke had initially requested prior to Kerin's revised Exhibit 10. In general, the PSC adopted Wittliff's conceptual construct as well as his calculations, allowing all environmental compliance costs associated with the CCR Rule but disallowing those related to CAMA. The PSC explained its "consistent past practice" was to disallow "costs incurred as a direct result of one state's laws, which are specific to that jurisdiction." Reasoning the Dan River spill was the impetus behind the North Carolina General Assembly's enactment of CAMA, the PSC concluded it would be unreasonable to require South Carolina customers to pay costs incurred as a result of Duke's admitted criminal negligence and the resulting unilateral action of the

---

[16] Wittliff additionally recommended that Duke should be able to further recover some of the construction expenses at Sutton (i.e., costs associated with decanting, dewatering, excavating, and stacking the coal ash) in the future, at a time when those expenses could be "attribut[ed] to the CCR rules only and not [] to schedule or scope changes imposed by CAMA." As we read this portion of his testimony, Wittliff would recommend the PSC allow Duke to return in the future—when the CCR Rule would require the utility to begin closing its coal ash ponds at Sutton—and recover the construction expenses at *that* time. However, as to any of the expenses that forever would be associated with CAMA—particularly the "rush" expenses, such as the cost of rush shipping for the dewatered coal ash—Wittliff would recommend those amounts be permanently disallowed. At oral arguments, ORS opposed the possibility of the PSC "belatedly" allowing Duke to recover any previously incurred costs associated with coal ash remediation. In terms of Duke's ability to potentially recover these remediation costs in a future proceeding, the PSC order speaks for itself. Nevertheless, we express no opinion at this time as to the propriety of allowing in the future the categories of costs outlined by Wittliff.

North Carolina General Assembly.[17]  The PSC also noted CAMA did not confer any benefits to South Carolina ratepayers, nor did the ratepayers have any opportunity to influence the North Carolina General Assembly's actions since those legislators did not represent South Carolina ratepayers.[18]  Nonetheless, the PSC emphasized several times that the disallowance of CAMA costs was only its decision "at this time," and future developments could change its position.[19]

---

[17] We respectfully disagree with the dissent's suggestion that the PSC punished Duke because it "caused" CAMA to be enacted.  The PSC merely stated the obvious in noting "the spill at Dan River was an impetus for the enactment" of CAMA.  CAMA's clear objective was (and remains) remedial, not punitive.  Perhaps it is fair to associate the concept of punishment with two matters in the record: (1) Duke's guilty pleas for criminal conduct; and (2) the $100 million mismanagement penalty imposed in the North Carolina proceedings.  Otherwise, in our judgment, the concept of punishment does not apply.  In addition, as we explain below, the PSC clearly harbored no animus against Duke, for the PSC has left the door open for Duke to potentially recover CAMA related costs in a future proceeding.

[18] The PSC additionally cited article X, section 5 of the South Carolina Constitution, which generally prohibits levying taxes or charges upon South Carolinians "without the consent of the people or their representatives lawfully assembled," implying South Carolina ratepayers could not be forced to pay for costs resulting from the actions of the North Carolina General Assembly.

[19] Duke filed a petition for rehearing claiming, for the first time, that denying Duke its CAMA-related costs would violate the dormant Commerce Clause of the United States Constitution.  *See generally* U.S. Const. art. I, § 8, cl. 3; *McBurney v. Young*, 569 U.S. 221, 234–37 (2013) (explaining the concept of the dormant Commerce Clause).  The PSC found the argument unpreserved.  We agree Duke failed to preserve this argument for appellate review.  *See, e.g.*, *Herron v. Century BMW*, 395 S.C. 461, 469, 719 S.E.2d 640, 644 (2011) ("[A] party may not raise an issue for the first time in a petition for rehearing."); *Kiawah Prop. Owners Grp. v. Pub. Serv. Comm'n*, 359 S.C. 105, 113, 597 S.E.2d 145, 149 (2004) (holding unpreserved an issue first broached by the utility in its petition for rehearing to the PSC).

*b. Analysis*

In order to prevail on appeal, Duke must demonstrate that the PSC's orders were controlled by an error of law, arbitrary and capricious, or clearly erroneous. *See* S.C. Code Ann. §1-23-380(5)(d)–(f). Duke primarily insists that disallowing CAMA costs was an error of law because the costs were reasonably and prudently incurred in the delivery of power generation services to South Carolina customers. When pushed at oral argument for a specific case or authority in support of its contention of legal error, we were directed to a single case—the District of Columbia Circuit's decision in *Northern Virginia Electric Cooperative, Inc. v. Federal Energy Regulatory Commission*, 945 F.3d 1201 (D.C. Cir. 2019)—as standing for the proposition that the PSC committed legal error. We disagree and instead find that case supports the PSC's decisions.

In *Northern Virginia Electric Cooperative*, in a proceeding before the Federal Energy Regulatory Commission (the Commission), a utility operating in both North Carolina and Virginia sought to upgrade its electricity transmission grid and allocate the costs proportionately among its customers in both states. *Id.* at 1203. However, the Virginia legislature passed a law requiring the utility to place any new transmission wires underground, rather than using cheaper overhead wiring, thereby increasing the cost of the grid upgrade by approximately threefold. *Id.* North Carolina customers objected to paying for the costs associated with the undergrounding, arguing the Virginia legislature mandated undergrounding for "local aesthetic reasons which did not benefit anyone in North Carolina." *Id.* at 1206 (internal quotation marks omitted) (citation omitted). The utility and Virginia customers countered, citing to the historic practice of sharing total system costs for the utility between its customers in both jurisdictions, and the general rule that, "'when a system is integrated, any system enhancements are presumed to benefit the entire system.' Thus, in the mine run of cases, all customers on a grid benefit from—and share in—the costs of upgrading the grid." *Id.* at 1207 (internal alteration marks omitted) (quoting *W. Mass. Elec. Co. v. Fed. Energy Regul. Comm'n*, 165 F.3d 922, 927 (D.C. Cir. 1999)). The Commission concluded the costs of undergrounding should be borne by the Virginia customers alone because the evidence showed Virginia customers benefitted from undergrounding, while there was no evidence North Carolina customers directly benefitted from burying the transmission lines. *Id.* at 1203; *see also Old Dominion Elec. Coop. v. Va. Elec. & Power Co.*, No. EL10-49-000, 2014 WL 1097407, at *13 (F.E.R.C. Mar. 20, 2014) ("Parties provide no indication that the Projects were constructed underground for reliability reasons, [which could indicate a benefit to the entire grid]. It follows that, as a consequence of these initiatives by the Commonwealth

of Virginia, only Virginia customers benefit from the incremental cost of undergrounding the facilities. The North Carolina customers do not receive benefits from the undergrounding of the Projects that justify allocating the substantially higher costs of undergrounding to these customers." (internal footnote omitted)), *aff'd sub nom. N. Va. Elec. Coop., Inc.*, 945 F.3d at 1201. The Commission also noted its "decision represented 'a limited exception' to a general principle that all of a utility's customers should share the costs of upgrading the grid." *N. Va. Elec. Coop., Inc.*, 945 F.3d at 1203 (citation omitted).

The District of Columbia Circuit affirmed the Commission's decision. *Id.* at 1203, 1208. In relevant part, the court cited to the Commission's long-established adherence to the cost causation principle, "under which a utility should assign costs to those customers who caused them or benefit from them." *Id.* at 1207. The court explained that the cost causation principle underlay the general rule that all customers of an integrated system are presumed to benefit from, and pay for, any system upgrades. *Id.* However, as it related to the costs associated with Virginia's undergrounding statute, the court concluded the Commission had correctly found the benefits inured entirely to the benefit of the utility's Virginia customers. *Id.* Specifically, the court rejected the argument that there was no "affirmative evidence that North Carolinians didn't benefit from the undergrounding," citing "(1) the mountain of evidence that Virginians clamored for the undergrounding; (2) the Virginia legislature's apparent intent to act for the benefit of its citizens; [and] (3) the absence of any evidence that North Carolina customers caused or benefitted from the undergrounding." *Id.* at 1207–08. The court concluded, "Put it all together, and it adds up to substantial evidence that Virginians benefited from the undergrounding but North Carolinians did not." *Id.* at 1208.

Duke cites this case for the general rule it recites: in an integrated system that encompasses multiple jurisdictions, system costs are presumed to benefit the entire system, and, thus, in general, customers from each jurisdiction must pay their allocable share of the system costs. We take no issue with this general approach. However, as in the *Northern Virginia Electric Cooperative* case, we find the instant case presents one of the "limited exceptions" to the general rule.

Here, there is no evidence of any direct benefit to South Carolinians that stems from coal ash remediation costs required by North Carolina's CAMA scheme. Duke presented evidence that South Carolina ratepayers had historically enjoyed lower utility rates due to the power-generation and cost-sharing arrangement between the two states. Following the production of that low-cost power, South Carolinians paid for their pro rata share of any then-applicable environmental regulations related to disposing of the coal ash generated. CAMA, however, is a

post hoc environmental remediation scheme intended by the North Carolina General Assembly to ensure the cleanliness, safety, and beauty of North Carolina's environment and the health of North Carolina's citizens. Duke's reliance on the power-generation and cost-sharing arrangement conflates the benefits of joint electricity production with the benefits of cleaning up a previously-legal, unlined coal ash pond or landfill. The environmental cleanup costs are wholly unrelated to the current production of power for which South Carolina ratepayers must pay. Had CAMA never been passed, South Carolina's ratepayers would have enjoyed the same benefits and low-cost electricity that they received after CAMA's passage.

The PSC made the factual determination that the CAMA costs sought here neither directly benefitted Duke's South Carolina customers, nor were they intended to do so. There is evidence in support of this factual determination. *See N. Va. Elec. Coop., Inc.*, 945 F.3d at 1207–08 (upholding the Commission's finding that North Carolinians did not benefit from undergrounding because the utility failed to introduce evidence to that effect, and because, in passing the undergrounding statute, the Virginia legislature intended to act for the benefit of its own citizens). We thus conclude the PSC did not commit an error of law in disallowing CAMA costs. *See Utils. Servs. of S.C., Inc.*, 392 S.C. at 105, 708 S.E.2d 760 (explaining that, in evaluating the evidence, the PSC is permitted to find "that some portion of an expense actually incurred by a utility should not be passed on to consumers").

Failing in its assertion of legal error, Duke next asserts the PSC's decisions regarding CAMA expenses were arbitrary and capricious. However, Duke repeatedly characterized this issue—whether the PSC should require South Carolina ratepayers to pay for expenses caused by another state's laws—as a policy decision, contending so at least eight times in its briefs. It is true the General Assembly designated the PSC as the expert in policy determinations with regards to utility ratemaking, and the Court does not lightly overturn those policy-based decisions. *See Patton*, 280 S.C. at 291, 312 S.E.2d at 259 ("The [PSC] is recognized as the 'expert' designated by the legislature to make policy determinations regarding utility rates; thus, the role of a court reviewing such decisions is very limited."). However, the issue before us is more properly characterized as a factual determination on the benefit, or lack of benefit, to South Carolina customers from CAMA related remediation costs. It appears Duke believes that by recasting the findings of the PSC as a mere policy decision, it makes it an easy leap to assert a legal error. The PSC made a factual determination that Duke's South Carolina customers did not benefit from the North Carolina-specific CAMA law. Because there is evidence to support this finding, we may not

rely on contrary evidence and (assuming we were inclined to do so) substitute our view of the facts for the PSC. As we have already found, Duke has shown no such legal error.

Moreover, the orders here are not arbitrary or capricious because they comport with the PSC's long-established adherence to the cost causation principle. As explained above, North Carolina customers benefit—and were intended to benefit—from CAMA's requirements, whereas South Carolina customers do not enjoy a similar, direct benefit. *Cf. N. Va. Elec. Coop., Inc.*, 945 F.3d at 1207–08 (explaining the cost causation principle and making a similar finding in determining Virginia customers were required to pay for the costs of undergrounding, but North Carolina customers were not). Thus, as the PSC and multiple witnesses opined, although the PSC has, in the past, approved generally of a cost-sharing arrangement between Duke's North and South Carolina customers, the PSC's disallowance of Duke's CAMA compliance costs was consistent with its long-standing adherence to the cost causation principle. *See id.* at 1207 ("Indeed, as the Commission [correctly] recognized, its departure from its policy of having all customers pay for upgrading a grid here *maintained* consistency with the broader cost causation principle: Though the benefits of conventional grid enhancement are shared throughout the grid, here Virginians uniquely caused and benefited from the undergrounding.").

We also find significant the fact that Duke directly allocated certain coal ash costs to North Carolina customers, including some CAMA costs. While Duke may disagree with the PSC's factual findings regarding which expenses were unique to CAMA and North Carolina ratepayers, it apparently does not disagree with the broader principle that certain costs should not be shared among all of Duke's customers in both states. We therefore find the PSC's decision was not arbitrary or capricious.[20]

_____

[20] While not directly relevant to our analysis, at oral argument, counsel for ORS represented to the Court that (1) the percentage of Duke's coal ash excavation costs allocated to North Carolina and required to be paid by that state's ratepayers is approximately the same percentage as that allocated to South Carolina and required to be paid for by our state's ratepayers; and (2) the remainder of North Carolina's share of coal ash remediation costs was paid for by Duke's shareholders. Those facts do not appear in the record, although Duke did not directly dispute them at oral argument. Regardless, the seminal utility regulation decisions of the United States Supreme Court stand for the proposition that the results of a ratemaking proceeding must be fair to ratepayers and shareholders alike. *See generally, e.g.,*

Finally, Duke avers the PSC's decision was clearly erroneous and unsupported by the substantial evidence in the record. We disagree. It is clear from the level of detail set forth in the PSC's orders that it thoroughly and thoughtfully weighed the testimony and evidence prior to reaching its decisions. Given the voluminous record, it is unsurprising that some of the witnesses' testimony was conflicting. However, apparently, the PSC found Wittliff's classifications and calculations of coal ash remediation costs were the most accurate. "We recognize that the [PSC's] interpretation of the evidence on this issue is not indisputable, but we cannot substitute our judgment for that of the [PSC] upon a question as to which there is room for a difference of intelligent opinion." *Parker v. S.C. Pub. Serv. Comm'n*, 281 S.C. 22, 24, 314 S.E.2d 148, 149 (1984) (internal alteration and quotation marks omitted) (citation omitted); *see also Hamm v. S.C. Pub. Serv. Comm'n*, 294 S.C. 320, 323, 364 S.E.2d 455, 456 (1988) ("This Court is without authority to set aside an agency's judgment on a factual issue where there is evidence of record to support the agency's decision."); *Lark v. Bi-Lo, Inc.*, 276 S.C. 130, 136, 276 S.E.2d 304, 307 (1981) (explaining that substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence" (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966))).

Of equal importance, Duke—as the party with the burden of proof before the PSC—made no attempt to respond to Wittliff's calculations by offering counter-calculations or similarly parsing the coal ash remediation costs into the amounts associated with CAMA versus the CCR Rule. As a result, once the PSC found CAMA costs could not be imposed on South Carolina customers, it was left with

---

*Hope Natural Gas Co.*, 320 U.S. at 602–03. To the extent the representations made by ORS's counsel are correct, we cannot imagine a reason why South Carolina's ratepayers should be required to pay a higher percentage of our state's allocable share of coal ash compliance costs than North Carolina's ratepayers. *See id.* at 602 ("Under the statutory standard of 'just and reasonable' [rates,] it is the result reached[,] not the method employed[,] which is controlling. It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry . . . is at an end. The fact that the method employed to reach that result may contain infirmities is not then important."). In any event, while we note this argument by ORS's counsel, because those facts do not appear in the record, we do not rely on them in our analysis or in reaching our holding today.

one set of numbers—Wittliff's—on which to base its final decision. Essentially, Duke took a gamble by pursuing an all-or-nothing stance with regards to the coal ash remediation costs and lost. That does not make the PSC's decision clearly erroneous or unsupported by substantial evidence.

Duke additionally argues Wittliff's testimony is unreliable and imprecise. For example, Duke criticizes Wittliff for relying on the total costs found in Kerin's original Exhibit 10, rather than Kerin's belatedly-filed, revised Exhibit 10. However, as alluded to above, it is unclear whether Wittliff truly erred in doing so, as Wright's exhibits (1) used identical numbers to Kerin's original Exhibit 10; (2) were more granularly detailed, in that they were broken down year-by-year, plant-by-plant; and (3) *were not similarly updated*.[21] We agree with the PSC that Wittliff's calculations are well-explained and reasonably certain. We find no abuse of discretion in his method of calculating the coal ash remediation expenses attributable to CAMA or the CCR Rule. *See Porter v. S.C. Pub. Serv. Comm'n*, 328 S.C. 222, 230, 493 S.E.2d 92, 97 (1997) ("We find no abuse of discretion in averaging the amount of net income generated as a practical means of determining the adjustment for customer growth, especially since the actual amount of income generated for a particular customer is not a readily ascertainable amount.").

---

[21] Moreover, even assuming Kerin's revised Exhibit 10 was the most accurate representation of Duke's coal ash remediation expenses, we find it ironic that Duke apparently does not realize that any possible error in Wittliff's calculations (based on Kerin's original Exhibit 10) inured to Duke's benefit. Specifically, for at least three of Duke's plants, the PSC allowed Duke more in remediation costs than it actually requested. For example, for DEP's Mayo plant, Duke originally requested $25.4 million per Wright's and Kerin's original exhibits. In Kerin's revised Exhibit 10, the amount requested was revised down to $13.7 million. Nonetheless, the PSC allowed Duke $25.4 million—$11.7 million more than Duke actually requested. The total amount of the indisputable errors of this type for both Duke entities was a net $22 million in over-recovery for Duke. *See, e.g., Porter v. S.C. Pub. Serv. Comm'n*, 328 S.C. 222, 230, 493 S.E.2d 92, 97 (1997) ("Absolute precision [in calculating the amount a utility should be allowed to collect from its ratepayers] is not required . . . ." (citation omitted)); *Hamm*, 309 S.C. at 291, 422 S.E.2d at 115 (same). More importantly, none of the parties noticed or raised this error; we only discovered it during our review of the record. While the Court may affirm a lower court's decision on any basis appearing in the record, it may not similarly reverse a decision unless the particular grounds for reversal have been raised by the parties. *See* Rule 220(c), SCACR.

Overall, the PSC "parsed all of the evidence presented during the hearing and provided a detailed summary of all of the testimony on which it based its very technical findings.  Thus, there is no doubt that the [PSC's] findings are supported by substantial evidence . . . ."  *S.C. Energy Users Comm. v. S.C. Elec. & Gas*, 410 S.C. 348, 361, 764 S.E.2d 913, 919 (2014).  As a result, we find Duke has failed to demonstrate that the PSC's factual findings are unsupported by reliable, probative, and substantial evidence.  *See S.C. Energy Users Comm.*, 388 S.C. at 491, 697 S.E.2d at 590 (explaining that, on appeal, the Court must view the PSC's findings as "presumptively correct," and the party who is challenging the PSC's order bears the burden to show the decision is unsupported by substantial evidence).

We finally address the dissent's argument that excluding remediation costs concerning the Cliffside, Riverbend, and Allen plants "from Duke's rate base . . . is arbitrary."[22]  As to these three Duke plants, the dissent contends "the stringent CAMA requirements clearly and directly benefit citizens of South Carolina."  The dissent selected these three plants (out of Duke's fourteen North Carolina plants) because of their proximity to the South Carolina border and the contention that the PSC disallowed Duke's remediation expenses at the three plants.  Two of the plants (Riverbend and Allen) abut the Catawba River, which flows into South Carolina. The third plant (Cliffside) abuts the Broad River, which also flows into South Carolina.  Yet the dissent acknowledges "[t]his was not a point on which the parties presented extensive evidence."  We agree that the dissent's argument— proximity to South Carolina rivers by itself establishes that CAMA requirements "clearly and directly benefit" South Carolinians—was never developed by Duke before the PSC, thus explaining why there is scant evidence in the record.  We first recognize the procedural bar to the dissent's approach, for an appellate court may not reverse on an issue not raised and preserved for review.  *See* Rule 220(c), SCACR.  There is an even more fundamental reason why Duke has never made the argument advanced by the dissent—the PSC allowed *full* recovery to Duke at two of these three plants.

The PSC awarded Duke full recovery for its coal ash remediation expenses at the Cliffside and Allen plants.  Duke's remediation efforts at Cliffside and Allen were

_____

[22] Much of the dissent consist of arguments Duke has never made.  It is a basic tenet of appellate law that appellate courts do not reverse based on issues and arguments never made by an appellant.  We comment on the alleged error of the PSC in "exclud[ing] those costs [from the Cliffside, Allen, and Riverbend plants] from Duke's rate base" only because it is largely untrue—the PSC awarded Duke its costs associated with the Cliffside and Allen plants.

required pursuant to both CAMA *and* the CCR Rule.  Because there was no opposition to Duke recovering all remediation expenses at the Cliffside and Allen plants, the PSC allowed all such costs to be included in Duke's rate base.  Simply stated, Duke prevailed.  This explains why Duke presented no objection concerning these two plants.  The dissent's position that these expenses were "exclude[d] . . . from Duke's rate base" is factually incorrect.

That leaves only the Riverbend plant.  Riverbend is located just north of Charlotte, North Carolina, and is an inactive plant with inactive coal ash ponds, meaning the CCR Rule does not apply to it at this time.[23]  However, under CAMA, the North Carolina General Assembly singled out Riverbend as a high-risk plant whose coal ash ponds had to be shut down on an accelerated schedule.  Because the CCR Rule does not currently apply to Riverbend, Wittliff recommended the PSC disallow all remediation costs at Riverbend at this time—a recommendation which the PSC adopted.

Moreover, it is pure speculation what, if any, benefits South Carolina ratepayers received from Duke's coal ash remediation efforts at Riverbend.  There was no spill from the Riverbend plant.  There is no evidence in the record that suggests a hypothetical spill at Riverbend would definitively travel far enough downstream so as to affect South Carolina's rivers or environment.  Duke had the burden of proving to the PSC that the coal ash remediation costs at Riverbend inured to the benefit of its South Carolina customers.  *N. Va. Elec. Coop., Inc.*, 945 F.3d at 1207–08.  Again, Duke made no attempt to establish anything to that effect, other than its general argument that all CAMA costs at all North Carolina plants should be allowed.  As such, we are constrained to find (1) Duke failed to shoulder its burden of proof, and therefore (2) the PSC's decision to disallow the costs at Riverbend is supported by substantial evidence.

Accordingly, we affirm the portions of the PSC's orders dealing with coal ash remediation expenses.

---

[23] Recall the District of Columbia Court of Appeals found the CCR Rule's exemption of inactive coal ash ponds at retired plants was arbitrary and capricious and remanded the rule to the EPA for further consideration.  The EPA's reconsideration of this issue could affect the ability of Duke to recover its expenses related to the Riverbend plant.

## IV.

## Litigation Expenses

### a. Underlying Facts

Duke requested nearly $1 million in legal fees related to coal ash litigation expenses: $390,000 for DEP, and $575,000 for DEC. The utility broadly claimed the expenses were related to ongoing insurance litigation and defending itself in an unspecified number of state enforcement actions. However, Duke made no effort to separately itemize the expenses for each of those two categories of cases, or to explain in any more detail what claims or defenses the cases involved, or how pursuing or defending the cases served the interests of South Carolina ratepayers.

ORS opposed Duke's request for litigation expenses, recommending the PSC limit Duke's recovery to only those expenses that were supported by sufficient explanation and not merely incomprehensible invoices.[24] ORS witness Steven Hamm testified Duke's request for litigation expenses was inappropriate due to "the extremely summary explanation provided by [Duke] to ORS['s] discovery inquiries." Hamm and others testified that, based on Duke's perfunctory justification for and documentation of the litigation expenses, it was impossible to determine whether "some or all of the litigation expenses were [incurred] defending claims that [Duke] violated state or federal law." Hamm opined that, to the extent the litigation expenses were incurred in cases stemming from illegal conduct or mismanagement, such as the Dan River spill, Duke was attempting to seek recovery of legal expenses that were not related to providing adequate electrical service to customers and from which customers derived no benefit. Thus, those "legal costs should be the shareholders' responsibility, which . . . in turn[] incentivizes the regulated utilities to operate in compliance with federal, state, and local law."

Towards the end of the PSC hearing, in response to ORS's criticism that Duke had not sufficiently documented its claimed expenses, the utility belatedly introduced a 1,500 page spreadsheet documenting every action taken by any attorney associated

---

[24] For example, in support of its claimed litigation expenses, Duke submitted spreadsheets of large expenses with brief explanations such as $125,114.72 for "legal fees and expenses related to potential insurance recovery for coal ash." Moreover, there were multiple entries with this explanation and approximately this dollar amount.

with any of the insurance or state enforcement actions.  More importantly, along with the spreadsheet, Duke submitted an eight page explanation of the procedural posture and underlying facts of each of the cases for which Duke sought litigation expenses.

Ultimately, the PSC found Duke failed to provide sufficient evidence to substantiate its claimed litigation expenses, concluding Duke did not carry its burden to prove the expenses were reasonable or necessary or that the ratepayers derived any benefit from the expenditures.  The PSC found significant that Duke made no attempt to calculate the number of hours billed or total amount sought for each case, instead leaving that task to the PSC or ORS.  Likewise, Duke made no attempt to justify its reasons for pursuing, defending, or settling any of the cases.  Rather, as the PSC explained, Duke "was on notice in late 2018[25] that ORS was seeking discovery and substantial evidence supporting its rate case claim that all [Duke's] coal ash legal expenses were reasonable and should be paid by [Duke] customers in their utility rates."  Nonetheless,

> No [Duke] witness was offered before the [PSC] to present *and explain* the individual line-item legal and expense summary and dollar amounts listed in the computer print outs provided by [Duke] to ORS in discovery.  The Record reflects that [Duke] made no effort to explain or justify the additional legal expense printouts presented on the last day of the [ratemaking] hearing.  (*See* Ex. 71.)  Just as important, [Duke] made no effort to present evidence confirming which case or dispute was associated with each individual dollar amount entry on the new computer printouts. . . .

> A brief review of the coal ash legal summary information provided to ORS in discovery reveals that [Duke] s[ought] to require its customers to defend law suits filed by the state of North Carolina against [Duke].  (*See* Ex. 67 (. . . "Defense of coal ash state enforcement litigation").)  [Duke] made no efforts to explain to the [PSC] why its customers should be responsible for paying any legal cost or expense related to coal ash discharges when [Duke] earlier [pled] guilty to criminal negligence in mishandling its coal ash management responsibilities at Dan River. . . .

---

[25] The PSC hearings were held March 21–27, 2019 (DEC), and April 11–17, 2019 (DEP).

. . . .

> An examination of [Duke's] responses to ORS legal expense discovery filings merely reflects a series of dollar amounts without any reference to the specific litigation matter prompting the litigation expense in the first place. [Duke] failed to provide the [PSC] with any basis to support a claim that customers are responsible [for] reimbursing [Duke] since the data provided by [Duke] is devoid of any case specific identifying data. [Duke] must substantiate the expenses for which it s[ought] recovery, and [Duke] has failed to do so.

(Emphasis added.)

Duke's argument in its petition for rehearing on this issue was cursory at best, encompassing a single double-spaced page. In particular, Duke argued it was entitled to a presumption of the reasonableness of its litigation expenses, that its coal ash litigation expenses related to the "normal and prudent operations of an enterprise like" Duke, and that the litigation (particularly, the insurance litigation) would benefit ratepayers if Duke was successful. Therefore, Duke argued, the PSC's decision was arbitrary and capricious.

In response to Duke's petition for rehearing, the PSC further explained it could not "presume that the expenses a utility seeks to recover in its rates and charges are legitimate if they cannot be subjected to the scrutiny of an audit or examination." Thus, "absent more detailed information by way of which the [PSC] could determine with more certainty whether recovery of these expenses from the ratepayers would be just and reasonable," the PSC ruled Duke "had failed to carry its burden."

### b. Analysis

Duke now argues it was not given sufficient opportunity to provide supporting documentation for its litigation expenses. Duke contends that, prior to the PSC hearing, ORS did not give Duke any notice that the 121,000 pages of discovery produced were inadequate to verify Duke's litigation expenses. Duke likewise complains that ORS asked the wrong discovery questions for the information it sought because "ORS did not request matter descriptions, factual inquiries, case summaries, contracts, or other documents."

Duke has failed to preserve its current argument because it did not present the argument to the PSC initially or in its petition for rehearing. We therefore affirm

pursuant to Rule 220(b)(1), SCACR, and the following authorities: *McLeod v. Starnes*, 396 S.C. 647, 657, 723 S.E.2d 198, 204 (2012) ("A party may not argue one ground at trial and an alternate ground on appeal." (citation omitted)); *Brown v. S.C. Dep't of Health & Env't Control*, 348 S.C. 507, 519, 560 S.E.2d 410, 417 (2002) ("[I]ssues not raised to and ruled on by [an administrative] agency are not preserved for judicial consideration.").

Moreover, even if this issue were preserved, we agree with the PSC's conclusion that Duke failed to shoulder its burden of proof. First, Duke did not break down its litigation costs case-by-case or even in a summary fashion that would be easily understood by the fact finder. It may have been technically possible for the PSC or ORS to sort through the 1,500 page spreadsheet and parse the data themselves. However, we decline to impose a requirement that they do so, particularly since Duke had the burden of proof.

Likewise, and more importantly, none of Duke's witnesses explained the lengthy spreadsheets, the actions detailed therein, or how those actions benefitted Duke's ratepayers, if at all. Thus, we agree with the PSC that it was impossible to tell if any of the cases included in the spreadsheet benefitted the ratepayers in any quantifiable way. *See, e.g.*, *Hilton Head Plantation Utils., Inc. v. Pub. Serv. Comm'n*, 312 S.C. 448, 451, 441 S.E.2d 321, 323 (1994) (explaining that "a mere showing of actual payment does not establish a *prima facie* case of reasonableness," and rejecting the utility's argument that "all amounts paid were reasonable simply because they were paid").

Accordingly, we affirm the PSC's decisions as to the litigation expenses issue.

## V.

### Carrying Costs for Deferred Accounts

#### a. Underlying Facts

The Court has previously "approved the historical test year as a basis for calculating a utility's rate base so long as adjustments are made for any known and measurable out-of-period changes in expenses, revenues, and investments that would materially alter the rate base." *Porter*, 328 S.C. at 228–29, 493 S.E.2d at 96 (explaining the concept of the historical test year in more detail). The historical test year recognizes that ratemaking is a prospective process in which customers who currently use the system pay for its production, rather than requiring future ratepayers to pay for past use. *Id.* at 231, 493 S.E.2d at 97. However, in certain situations, test year expenses may be adjusted to allow recovery for so-called

deferred charges, i.e., expenses actually incurred before the test year. *Id.* at 231–33, 493 S.E.2d at 97–98.

These deferred expenses generally come in one of two forms: (1) capital costs or (2) operations and maintenance costs. Capital costs can include things like the value of power-production plants, equipment (e.g., scrubbers for coal plants, a fleet of company vehicles, computers), any purchased land, and the like. A utility is normally entitled to earn a rate of return on its capital costs because the utility is essentially allowing the public to use what would otherwise be the utility's private property. Therefore, the Supreme Court and state legislatures have all recognized that some degree of profit above and beyond the actual cost of the property is proper to avoid the public "taking" the property without just compensation to the utility. *See, e.g.*, *Bluefield*, 262 U.S. at 690 ("Rates which are not sufficient to yield a reasonable return on the value of the property used at the time it is being used to render the services are unjust, unreasonable and confiscatory, and their enforcement deprives the public utility company of its property in violation of the Fourteenth Amendment. . . . What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. There must be a fair return upon the reasonable value of the property at the time it is being used for the public." (internal citations omitted) (internal quotation marks omitted)).

In contrast to capital costs, operations and maintenance costs are the normal business costs associated with keeping the utility running. These can include things like telephone bills, internet bills, overhead, payroll, insurance, taxes, and the like. Compared to capital costs, operations and maintenance costs tend to be relatively minor in comparison to a utility's revenue. Operations and maintenance costs are normally recovered dollar-for-dollar by the utility, without receiving a rate of return, as there is no need to compensate the utility for the use of its property. In other words, while the utility nominally pays the operations and maintenance costs, those costs are fully passed through to consumers, so the operations and maintenance costs do not actually "cost" the utility any of its own—or its shareholders'—money.

Here, with the PSC's permission, Duke created deferred accounts for several expenses, all of which involved operations and maintenance costs. As with all deferred accounts, Duke paid the expenses on behalf of its customers but did not seek immediate recovery via a new ratemaking application.

Subsequently, in the instant ratemaking proceeding, Duke requested the PSC allow it to recover the amounts in the deferred accounts, and additionally recover carrying costs in recognition of the delay in seeking recovery of the deferred

amounts from its ratepayers. Duke argued the amounts represented in the deferred accounts would otherwise rightfully be the shareholders' money via payment of stocks and dividends. In Duke's opinion, the creation of a deferred account essentially borrowed money from the shareholders on behalf of the ratepayers, and therefore the ratepayers should have to pay the utility and its shareholders back with interest. Essentially, Duke's argument reflected the old adage: a dollar on hand today is worth more than a dollar to be received in the future. Thus, although Duke acknowledged that operations and maintenance costs generally were not subject to carrying costs, it nonetheless believed carrying costs were required in this instance in order to make the shareholders'—and the time-value of their money—whole.

In response, ORS contended there were three primary problems with Duke's position. First, ORS pointed out that were it not for the operations and maintenance costs having been deferred, Duke would not have been entitled to a carrying costs on those expenses. According to ORS, Duke collected $562 million in operations and maintenance expenses in 2017 (the test year for this ratemaking proceeding), so the money to pay for deferred expenses and support its operations did not necessarily come from shareholders.

Second, ORS expressed concern that, if the PSC were to routinely allow carrying costs on deferred accounts created for operations and maintenance costs, it would incentivize utilities to create deferred accounts on a more frequent basis for less-than-extraordinary expenses, thus entitling the utility to more of a profit than it otherwise could expect. The impact of the frequent creation of deferred accounts, particularly for operations and maintenance costs, would be to "greatly inflate[] costs in future years which w[ould] be passed on to customers through rates."

Third, ORS asserted that, in accordance with fundamental regulatory accounting principles, operations and maintenance costs were not entitled to carrying costs and, therefore, were inappropriate to include with other rate base (i.e., capital cost) items. As one ORS witness explained at the PSC hearing:

> Out-of-year expenses include[d] approximately $5,000,000 in amortization expense. ORS's recommended accounting treatment contribute[d] approximately $3,500,000 to the ORS original proposed revenue increase of $32,130,000--more than 10 percent. In comparison, [Duke's] deferred balance proposal include[d] approximately $16,000,000 in amortization expense and approximately $21,000,000 in unamortized deferral balances in rate base. [Duke's] recommended treatment contribute[d] roughly

$18,000,000 (*more than 25 percent*) to [Duke's] proposed revenue increase of $68,668,000.

(Emphasis added.)  Thus, according to ORS, when viewed within the context of the entire rate case, Duke's overall strong financial position, and the needs of Duke's customers, "ORS's proposals represent[ed] a reasonable and equitable approach to [Duke's] recovery of deferred costs."

Ultimately, the PSC allowed Duke full, dollar-for-dollar recovery of the amounts deferred—the standard practice for non-deferred operations and maintenance costs.  However, the PSC disallowed Duke the requested carrying costs.  The PSC concluded that to rule in favor of Duke's position would encourage the utility to seek more accounting deferrals in the future, which would "greatly inflate costs in future years, which w[ould] be passed on to customers through rates."  The PSC explained it generally set rates based on a historic test year, and allowing unconditional carrying costs on all deferrals incurred in years prior to the test year "would represent a significant departure from this fundamental standard."

The PSC also emphasized that ratemaking was a prospective process, in which it used the historical test year to set rates for estimated future costs within a reasonable degree of certainty, subject to any adjustments for known and measurable out-of-period changes in expenses, revenues, and investments:

> The purpose of this regulatory scheme of using a test year and making adjustments based on atypical conditions is to permit sufficient and accurate cost recovery as the expenses are incurred by the utility in real-time.  In other words, the purpose of this ratemaking exercise of using a test year and making appropriate adjustments is to match—as closely as possible—the utility's revenue to the costs it will incur after the rates are implemented.  *In that regulatory context, there is no need to consider the time value of money or the carrying costs of debt because the utility's revenue matches its expenses as they are incurred*.

(Emphasis added) (internal citations omitted).

Duke filed a petition for rehearing, but the PSC affirmed its initial decision.  The PSC noted:

> Treatment of deferrals is ultimately a matter of the [PSC's] discretion.  The [PSC] has a duty to balance the needs of the public and the utility such that the public is served without the utility being disserved.  This

approach [denying carrying costs in the initial order] represents
exactly such a balance.

### b. Analysis

This issue presents a quintessential policy determination to which there is no one
right answer. Duke and ORS both raised valid points about the pros and cons to
each side's position. The PSC was faced with a policy decision and made a choice.
There is certainly evidence in the record to support its conclusion, and we therefore
decline to reverse the PSC's decision, particularly given that the PSC generally
approaches the question of the propriety of carrying costs on deferred accounts on
a case-by-case basis to better consider the individual impact on the utility and the
ratepayers. *See Utils. Servs. of S.C., Inc.*, 392 S.C. at 103, 708 S.E.2d at 759
("[This Court] will not substitute [its] judgment for that of the PSC where there is
room for a difference of intelligent opinion." (citation omitted)); *Patton*, 280 S.C.
at 291, 312 S.E.2d at 259 ("The [PSC] is recognized as the 'expert' designated by
the legislature to make policy determinations regarding utility rates; thus, the role
of a court reviewing such decisions is very limited."); *S. Bell Tel. & Tel. Co.*, 270
S.C. at 597–98, 244 S.E.2d at 282 ("The weighing of the evidence and the drawing
of the ultimate conclusion therefrom as to what return is necessary to enable a
utility to attract capital is for the [PSC], not the reviewing court."). We therefore
affirm the PSC's decisions as to the carrying costs issue.

## VI.

### Construction Costs for the Lee Nuclear Project

### a. Underlying Facts and the Base Load Review Act

In normal ratemaking proceedings, every rate asked for by the utility and approved
by the PSC must be just and reasonable. S.C. Code Ann. § 58-27-810 (2015).
Likewise, the General Assembly has specified that there is a "critical need to []
protect customers from rising utility costs." *Id.* § 58-27-845(A)(1) (Supp. 2020).
As a result, in fixing just and reasonable rates, the PSC is required to consider the
prudence of the utility's expenditures "to discourage the wasteful use of public
utility services while promoting all use that is economically justified in view of the
relationships between costs incurred and benefits received." *Id.* § 58-27-845(C).

To become entitled to collect new rates, a utility must file an application for
ratemaking with the PSC and ORS in which it sets forth a proposed rate schedule.
*Id.* § 58-27-820 (2015). After the utility files its proposed schedule, the PSC is
required to hold a public hearing concerning the reasonableness of the proposed

changes, and is further required to issue an order ruling on the proposed rates within a specified amount of time. *Id.* § 58-27-870 (2015). In practical terms, therefore, a utility must justify the prudency of its past-incurred expenses every time it comes in for a new ratemaking proceeding.

Thus, prior to the enactment of the BLRA,

> [A] utility's decision to build a base load generating plant was subject to relitigation if parties brought prudency challenges after the utility had committed to major construction work on the plant. The possibility of prudency challenges while construction was underway increased the risks of these projects as well as the costs and difficulty of financing them.

*S.C. Energy Users Comm.*, 410 S.C. at 359, 764 S.E.2d at 918.

The BLRA was intended to cure that problem. *Id.* Specifically, "the General Assembly sought to mitigate such uncertainty by providing for a comprehensive, fully litigated and binding prudency review *before* major construction of a base load generating facility begins." *Id.* (emphasis added); *see also S.C. Energy Users Comm.*, 388 S.C. at 494–95, 697 S.E.2d at 592 (discussing the legislative intent behind the BLRA). Thus, if a utility filed a BLRA application, and it was able to establish the prudency of building a nuclear plant and incurring—in the future—all of the associated costs with that construction, then it could recover "preconstruction" costs through rates from ratepayers before it had spent any of its own money, thereby placing all of the risk for the failure of that project on the ratepayers, rather than on the utility. *See* S.C. Code Ann. § 58-33-225. Preconstruction costs were specifically defined in the BLRA to include AFUDC (allowance of funds used during construction). *Id.* § 58-33-220(1), (12). Essentially, AFUDC is another word for carrying costs, and is "calculated according to regulatory accounting principles." *Id.* § 58-33-220(1). Thus, an award of preconstruction costs automatically included carrying costs/AFUDC under the BLRA.

The only exception to a utility's ability to recover preconstruction costs was if a subsequent proceeding showed that individual costs items were imprudently incurred. *Id.* § 58-33-225(E). Other than that exception, prudency determinations could "not be challenged or reopened in any subsequent proceeding *including proceedings under [the general ratemaking proceedings statutes]*." *Id.* § 58-33-225(H) (emphasis added); *id.* § 58-33-275(A) ("A base load review order shall constitute a final and binding determination that a plant is used and useful for

utility purposes, and that its capital costs are prudent utility costs and expenses and are properly included in rates . . . ."); *id.* § 58-33-275(B) (stating the "used and useful" and prudency determinations made under section 58-33-275(A) "may not be challenged or reopened in any subsequent proceeding, including proceedings under [s]ection 58-27-810"). The BLRA expressly contemplated the possibility of filing an application for preconstruction costs under the BLRA, as well as an application for post-construction costs—that, for whatever reason, the utility had not recovered under the BLRA—under the general ratemaking statutes (sections 58-27-810, -820, and -870). *See id.* § 58-33-230(E); *id.* § 58-33-275(B). However, as explained above, the latter proceeding (under the general ratemaking statutes) would require the utility to establish the prudency of the expenditure of those already-spent, post-construction funds.

Here, DEC filed two applications under the BLRA in 2007 and 2011, eventually receiving permission from the PSC to incur up to $350 million in preconstruction costs through June 2012. DEC was also required to file quarterly reports with the PSC and ORS on expenditures and AFUDC, which it did.

Thereafter, DEC pursued the Lee Nuclear Project but experienced a number of delays that were largely out of its control. Eventually, following the 2017 V.C. Summer nuclear fiasco—which did not involve Duke—DEC decided to abandon the project entirely. By that point, it had incurred actual costs of $558 million for things such as land and right-of-way purchases, site preparation, and pursuing its combined license application with the United States Nuclear Regulatory Commission. Because the General Assembly had repealed the BLRA in the interim, DEC filed a general ratemaking application to recover those funds, of which South Carolina's allocable share was $125 million (including AFUDC). During the subsequent PSC hearing, there was no dispute that DEC had already spent this money, so these were not true "preconstruction" costs under the BLRA. As a result, because there was no BLRA-related predetermination of the prudency of the expenditures, DEC had to prove the prudency of the costs at the hearing.

Ultimately, the PSC allowed DEC to recover the $125 million over the course of the next twelve years, classifying the amount as "prudently incurred abandoned plant costs." The PSC noted that "[n]o other party to this proceeding[, including SCEUC,] presented testimony in opposition to [DEC's] recovery of its costs for the Lee Nuclear Project."

SCEUC filed a petition for rehearing, arguing that because DEC had initially proceeded under the BLRA to recover preconstruction costs, and the BLRA had been repealed, DEC could not now proceed under a general ratemaking application

to recover "preconstruction" costs. SCEUC also specifically took issue with the portion of the $558 million that comprised AFUDC. In particular, SCEUC contended the PSC had approved of preconstruction costs—including AFUDC—of $350 million through June 2012, and by that date, DEC had incurred $68 million in AFUDC. However, six years later, when DEC filed its general ratemaking application, the AFUDC costs had ballooned to $248 million. Thus, SCEUC contended DEC's unexplained six year delay in filing either a BLRA application *or* a general ratemaking application had "rewarded" DEC with an additional $180 million in AFUDC (from $68 million to $248 million).

The PSC denied SCEUC's petition for rehearing. In relevant part, the PSC found the repeal of the BLRA did not entirely foreclose DEC from recovering post-construction and abandonment costs associated with the Lee Nuclear Project. Rather, the PSC concluded:

> [N]either the passage nor the repeal of the BLRA preclude[d] the utility from recovering abandonment costs through base rate cases. Had the General Assembly intended Act 258 [repealing the BLRA[26]] to prohibit entirely the recovery of these costs, it could have included an explicit provision to that effect in the legislation, but it did not. We cannot, therefore, infer that Act 258 bars recovery in the manner argued by SCEUC. *See Tilley v. Pacesetter [Corp.]*, 333 S.C. 33, 40, 508 S.E.2d 16, 20 (1998) [(per curiam)] (had the legislature intended a specific remedy for certain Consumer Protection Code violation to be exclusive of any others, it would have so specified. However, because it did not, another statutory remedy was also available).

### b. Analysis

SCEUC argues the intent of the General Assembly in repealing the BLRA was "to protect ratepayers from nuclear costs that were not used [or] useful for providing electricity," including nuclear-plant abandonment costs. SCEUC contends that because DEC initially filed BLRA applications, it was foreclosed from changing course in the future (even if the BLRA had not been repealed) and filing general ratemaking applications instead. We disagree.

As this Court has explained:

---

[26] *See generally* Act No. 258, 2018 S.C. Acts 1872.

The cardinal rule of statutory construction is to ascertain and effectuate the intent of the legislature. Under the plain meaning rule, it is not the court's place to change the meaning of a clear and unambiguous statute. Where the statute's language is plain and unambiguous, and conveys a clear and definite meaning, the rules of statutory interpretation are not needed and the court has no right to impose another meaning. What a legislature says in the text of a statute is considered the best evidence of the legislative intent or will. Therefore, the courts are bound to give effect to the expressed intent of the legislature.

*Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000) (internal citations omitted) (internal quotation marks omitted). Likewise, we have repeatedly held that if the legislature intended a particular statute or remedy to be the exclusive path for a litigant to follow, "it could have specifically provided that." *Tilley*, 333 S.C. at 40, 508 S.E.2d at 20; *Hainer v. Am. Med. Int'l, Inc.*, 328 S.C. 128, 134, 492 S.E.2d 103, 106 (1997) (explaining that if the "Legislature had intended [a] certain result in [a] statute, it would have said so" (citing *Estate of Guide v. Spooner*, 318 S.C. 335, 457 S.E.2d 623 (Ct. App. 1995))).

In 2018, the General Assembly repealed the BLRA and prohibited any future awards under that Act unless a BLRA application was pending by June 28, 2018. Act No. 258, 2018 S.C. Acts at 1872. DEC did not have a BLRA application pending by that date and was thus prohibited from filing an application for preconstruction costs under the BLRA.

However, in repealing the BLRA, the General Assembly simultaneously enacted section 58-34-40 of the South Carolina Code (Supp. 2020). That statute provides, in relevant part, that any provision in the Code related to general ratemaking applications,

including, but not limited to, [s]ection 58-27-870(B), [is] suspended for purposes of the utility rates provided for by this chapter [dealing with the continuation of rate increases imposed under the BLRA] and for any [] matters *related to V.C. Summer Nuclear Reactor Units 2 and 3 at Jenkinsville, South Carolina*, pending before the [PSC] on or *after the effective date of this chapter*.

*Id.* (emphasis added). Thus, it appears the General Assembly contemplated the possibility that, even absent the BLRA, a utility could file a general ratemaking application and recover its past costs actually spent in pursuit of constructing a new nuclear plant. The General Assembly clearly acted to close this "loophole"—if it was, in fact, one—by prohibiting a general ratemaking application related to post-construction costs *for the V.C. Summer project*. Notably, the General Assembly did not close this supposed loophole for any other nuclear-construction project besides V.C. Summer.

Therefore, impliedly, DEC was permitted to recover its actual, out-of-pocket costs related to the Lee Nuclear Project. However, as was the case before the BLRA was enacted, DEC's expenditures were subject to a prudency evaluation before any recovery could be authorized by the PSC. Here, ORS agreed with DEC that the expenses were prudently incurred in pursuit of the Lee Nuclear Project before various factors changed and made abandonment of the project the most beneficial option for ratepayers, and the PSC accepted that view of the facts.[27] As the PSC noted in its initial order, SCEUC did not present any evidence to the contrary, nor did any other party. As a result, we find the PSC's decision is supported by substantial evidence, not arbitrary or capricious, and not controlled by an error of law. We therefore affirm.

## VII.

While these consolidated cases are undoubtedly complex, the PSC thoroughly and thoughtfully considered each of the issues on appeal and rendered decisions that were not arbitrary or capricious, not clearly erroneous, and not controlled by an error of law. As a result, we affirm the PSC's decisions in full.

**AFFIRMED.**

**HEARN, JAMES, JJ., and Acting Justice John D. Geathers, concur. FEW, J., concurring in part and dissenting in part in a separate opinion.**

---

[27] Moreover, DEC submitted quarterly reports to the PSC and ORS between 2011 and 2018, detailing its expenditures and AFUDC costs. These amounts were not a surprise, and, presumably, had DEC been acting imprudently, ORS would have stepped in long before DEC filed its 2018 ratemaking application.

**JUSTICE FEW:** I agree with the majority on its disposition of Duke's claims for litigation costs, carrying costs, and costs associated with the Lee Nuclear Project. I concur, therefore, in Sections IV, V, and VI of the majority opinion. I disagree, however, with the majority's rationale in Section III of the opinion relating to Duke's claim for environmental compliance costs associated with North Carolina law. On that point, I believe the Public Service Commission made an arbitrary decision and, thus, committed an error of law. As to Section III of the opinion, therefore, I respectfully dissent.

The central tenet of law governing the rate-setting responsibilities of a utility commission such as the Public Service Commission of South Carolina is that a utility is entitled to have included in its rate base those capital costs and operating expenses it reasonably incurred to enable the utility to provide the services for which the ratepayer must pay. Originally, and in most instances today, the utility's management team made prospective strategic business decisions on how to use capital and whether to incur expenses. These decisions are deemed by law to have been made on the basis of sound business judgment, and thus courts presume the decisions were reasonable. So long as the presumption is not rebutted, the utility commission is obligated to permit the costs of capital and expenses incurred as a result of those prospective decisions to be included in the utility's rate base. By permitting the utility to recover a fair rate of return on all costs reasonably incurred, the utility commission complies with the Fifth Amendment. *See generally S. Bell Tel. & Tel. Co. v. Pub. Serv. Comm'n*, 270 S.C. 590, 595-98, 244 S.E.2d 278, 281-82 (1978) (quoting *Bluefield Water Works & Improvement Co. v. Pub. Serv. Comm'n of W. Va.*, 262 U.S. 679, 692-93, 43 S. Ct. 675, 679, 67 L.Ed. 1176, 1182-83 (1923); *Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 602-03, 64 S. Ct. 281, 287-88, 88 L.Ed. 333, 345 (1944)).

This issue, however, is not about prospective business decisions Duke made to spend money. Rather, this issue is about decisions Duke made *not* to spend money, resulting in retrospective legal requirements that Duke now spend money. In the course of its coal ash disposal practices over the years leading up to the mandatory provisions of state and federal law the majority outlines so clearly, Duke was allowed to include in its rate base expenses it incurred in disposing coal ash. Duke's decisions to incur those expenses necessarily included the decision not to incur the additional expense of more environmentally sound coal ash disposal practices. The question of whether the expenses Duke has now incurred to comply with state and federal law should be included in Duke's rate base for South Carolina customers should nevertheless turn on the same point—reasonableness. If Duke acted reasonably in not taking extra precautions to control the environmental

consequences of its coal ash, then, when the state and federal governments came along later and required remediation, Duke should be allowed to have the new expenses included in its rate base. This is, in fact, the way the North Carolina Utilities Commission appears to have handled the question, and the way the majority handled the litigation costs in this case.

In my opinion, disallowing the cost of complying with another state's environmental laws simply because the requirements of that law were imposed by the other state's legislature is arbitrary and, therefore, erroneous. The PSC and the majority support their conclusion on several bases, each of which I find unpersuasive. First, the PSC suggested that Duke "caused" CAMA by its misconduct at Dan River. I have no doubt the Dan River disaster is what brought the need for coal ash disposal reform to the attention of members of the North Carolina General Assembly. It is wrong, however, to suggest that CAMA—or any other statute—could be imposed to punish an individual person or company. While Dan River certainly spurred the General Assembly to action, the ultimate legislation was designed to clean up and protect the environment of North Carolina, not to punish a corporate bad actor. To the extent the PSC denied Duke these costs because it believed Duke "caused" CAMA, the PSC's decision was arbitrary.

Second, the majority states "there is no evidence of any direct benefit to South Carolinians that stems from . . . CAMA." In my opinion, there is some evidence of a direct benefit to South Carolinians. This was not a point on which the parties presented extensive evidence. However, for several of the North Carolina plants where its law required remediation, the stringent CAMA requirements clearly and directly benefit citizens of South Carolina. For example, Duke's Cliffside plant on the Broad River and its Riverbend and Allen plants on the Catawba River are so close to where those rivers flow into South Carolina as to provide almost no downstream benefit to North Carolina residents and almost all downstream benefits to South Carolina residents.[28] I accept the majority's response to my point regarding the Cliffside and Allen plants. However, to say "there is no evidence of any direct benefit to South Carolinians that stems from coal ash remediation costs required by North Carolina's CAMA scheme" is not correct. To exclude those costs from Duke's rate base on the basis of such an incorrect premise is arbitrary.

---

[28] These sites and the coal ash storage basins located there appear to be from three to fifteen miles upriver from the South Carolina line.

Third, the majority relies on the "cost causation principle." In my view, that reliance is misplaced in this case. The general principle to which "cost causation" is an exception is that "[w]hen a system is integrated, any system enhancements are presumed to benefit the entire system." *N. Va. Elec. Coop., Inc. v. Fed. Energy Regul. Comm'n*, 945 F.3d 1201, 1207 (D.C. Cir. 2019) (alteration in original) (quoting *W. Mass. Elec. Co. v. F.E.R.C.*, 165 F.3d 922, 927 (D.C. Cir. 1999)). Duke's electric grid serving North and South Carolina is clearly integrated. Any cost Duke reasonably incurred to build its integrated grid—including the cost of constructing and operating coal-fired power plants—must be included in Duke's rate base. As the majority explains, coal combustion residue (coal ash) is a necessary byproduct of burning coal to generate electricity. Safely storing the coal ash is also a necessary part of operating a coal-fired power plant. As history demonstrates, the initial storage of the coal ash does not end the storage process. The coal ash must be monitored and contained over time. When the power plant closes, the disposal site must be closed. Therefore, the costs associated with remediating and closing coal ash storage at Duke's North Carolina facilities are part of the cost of operating the plant, and a necessary part of Duke's integrated electric grid. None of the North Carolina coal-fired plants could even have begun operations without considering the cost of coal ash storage, including not only how the storage would be maintained over time, but also how the storage would ultimately be closed. Thus, the additional costs imposed by CAMA are part of the originally-contemplated capital and expense costs for the plant itself. If the additional costs were reasonably incurred, then Duke is entitled to have them included in its rate base.

Perhaps the majority is correct Duke chose not to pursue the issue I raise, and thus, technically, the issue is not preserved for our review. Perhaps the majority is correct Duke did so because the PSC awarded all of Duke's claimed costs from Cliffside and Allen. Perhaps Duke did so because it could not defend its coal ash disposal practices over the years, and the inquiry I contend the law required the PSC to make would have left Duke in a worse position than where it stands today. Whatever the reason, the central tenet of law governing the PSC's rate-setting responsibilities requires the PSC to determine whether the utility acted reasonably in making decisions on how to use capital and whether to incur expenses. Even in these retrospective examinations of the utility's behavior, the central question remains reasonableness.

In this case, the question should not have been which state imposed which remediation requirement. The PSC should have conducted a fact-finding proceeding to determine whether Duke acted reasonably in not doing more to safely dispose of

coal ash in the years leading up to the federal CCR Rule.  To the extent Duke acted unreasonably in not taking steps to avoid the environmental consequences of its coal ash disposal, any of the compliance costs retroactively imposed on Duke by applicable law should be disallowed from Duke's rate base.  However, where Duke acted reasonably in not preventing the underlying condition now sought to be remediated, the retroactively imposed cost to remediate that condition should be included in Duke's rate base.

For these reasons, I respectfully dissent as to Section III of the majority opinion.